[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 29, 2011
JOHN LEY
CLERK

No. 10-10367
_____

D.C. Docket No. 1:09-cv-22926-DLG

HAROLD LEONEL PINEDA LINDO,

Plaintiff-Appellant,

versus

NCL (BAHAMAS), LTD,
d.b.a. NCL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 29, 2011)

Before BARKETT, HULL and KRAVITCH, Circuit Judges.

HULL, Circuit Judge:

Plaintiff-Appellant Harold Leonel Pineda Lindo ("Lindo") appeals the

district court's enforcement of the arbitration agreement in his employment

contract with Defendant-Appellee NCL (Bahamas) Ltd. ("NCL"). Lindo sues

NCL on a single count of Jones Act negligence, pursuant to 46 U.S.C. § 30104.

He claims that NCL breached its duty to supply him with a safe place to work.

The district court granted NCL's motion to compel arbitration and dismissed

Lindo's complaint.

Given the New York Convention and governing Supreme Court and Circuit

precedent, we must enforce the arbitration clause in Plaintiff Lindo's employment

contract, at least at this initial arbitration-enforcement stage. After review and oral

argument, we affirm the district court's order compelling arbitration of Lindo's

Jones Act negligence claim.

## I. FACTUAL BACKGROUND

Plaintiff Lindo is a citizen and resident of Nicaragua. Defendant NCL is a

Bermuda corporation that operates cruise ships, with its principal place of business

in Miami, Florida. See Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 126,

125 S. Ct. 2169, 2175 (2005) (referring to NCL as "a Bermuda corporation with a

principal place of business in Miami, Florida").

NCL employed Lindo to serve as a crewmember on the M/S Norwegian

Dawn, which flies a Bahamian flag of convenience.[1] The ship typically departs

---

[1] A flag of convenience indicates the ship's country of registration.

from ports in the United States and travels to international locales, such as Bermuda, Canada, and venues throughout the Caribbean.

Lindo alleges that in December 2008, while acting in the scope of his employment on NCL's private island in the Bahamas,[2] he injured his back after he was ordered to transport heavy trash bags to the ship. He later underwent surgery to correct the injury.

## A. Lindo's Employment Contract

Lindo's employment with NCL was governed by (1) a collective bargaining agreement ("CBA") negotiated by NCL and the Norwegian Seafarers' Union, and (2) an employment contract (the "Contract"), which Lindo executed in January 2008.

Lindo's Contract provides that the "[e]mployee and the employment relationship established hereunder shall at all times be subject to and governed by the CBA." Lindo's Contract also provides that, notwithstanding whether he is a union member, he "understands and agrees that with respect to the Employer's obligations under general maritime law in the event of injury or illness, the terms of the CBA control and the Employee will be provided with benefits, including

---

[2]At oral argument, Lindo's counsel stated his understanding that NCL's private island was located in the Bahamas.

unearned wages, maintenance, cure and medical care and will be compensated in accordance with said CBA." Lindo's Contract "acknowledges that he[] has had an opportunity to review said CBA."

Paragraph 12 of Lindo's Contract specifies that all Jones Act claims will be resolved by binding arbitration pursuant to the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention" or "the Convention"):

> Seaman agrees . . . that any and all claims . . . relating to or in any way connected with the Seaman's shipboard employment with Company including . . . claims such as personal injuries [and] Jones Act claims . . . shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards . . . .

The Convention requires courts in signatory nations to give effect to private international arbitration agreements and to recognize and enforce arbitral awards entered in other contracting states. See The United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. The CBA likewise provides that Jones Act claims will be resolved by binding arbitration pursuant to the Convention.

As to the place of arbitration, Lindo's Contract states that "[t]he place of the arbitration shall be the Seaman's country of citizenship, unless arbitration is

4

unavailable under The Convention in that country, in which case, and only in that case, said arbitration shall take place in Nassau, Bahamas." As to the choice of law, Lindo's Contract provides, "The substantive law to be applied to the arbitration shall be the law of the flag state of the vessel." This entailed that any claim, including Lindo's Jones Act claim, would be arbitrated in Nicaragua (Lindo's country of citizenship) under Bahamian law (the law of the flag state of the vessel).[3]

Lindo does not challenge <u>the place</u> of arbitration. Rather, Lindo challenges having arbitration at all because Bahamian negligence law, not U.S. statutory negligence law under the Jones Act,[4] would apply.

## B.    Procedural History

In 2009, Lindo filed suit in Florida state court. He asserted various claims: (1) Jones Act negligence, pursuant to 46 U.S.C. § 30104 (Count I); (2) failure to

---

[3]The CBA further provides that the arbitration will be administered by the American Arbitration Association and that "[t]he arbitration referred to in this Article is exclusive and mandatory. Lawsuits or other proceedings between any Seafarer and/or the Union and NCL may not be brought except to enforce the arbitration provision of this Agreement or to enforce a decision of the Arbitrator."

[4]The Jones Act provides:
A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.
46 U.S.C. § 30104.

provide entire maintenance and cure (Count II); (3) failure to treat and provide adequate medical cure (Count III); (4) unseaworthiness (Count IV); and (5) an unnumbered count for disability benefits under the CBA. NCL filed a motion to dismiss and compel arbitration.

Pursuant to 9 U.S.C. § 205, NCL also removed the action to the U.S. District Court for the Southern District of Florida and sought to compel arbitration. Lindo filed a second amended complaint alleging a single count of Jones Act negligence. Lindo's related motion stated that "NCL has to date met its maintenance and cure obligations."

Subsequently, Lindo opposed NCL's motion to dismiss and sought a remand to state court. Lindo argued that the arbitration provision in his Contract was void as against public policy because it operated as a prospective waiver of his Jones Act claim. Alternatively, Lindo contended that the arbitration provision should not be enforced due to the economic hardship Lindo would incur because his Contract was unclear regarding the extent to which he must pay arbitration costs.

The district court denied Lindo's motion to remand, granted NCL's motion to compel arbitration, and dismissed Lindo's second amended complaint. See Lindo v. NCL (Bahamas) Ltd., No. 09-22926-CIV, 2009 U.S. Dist. LEXIS

6

129452, at *10 (S.D. Fla. Dec. 23, 2009); see also 9 U.S.C. § 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."). Lindo timely appealed.

## II. THE NEW YORK CONVENTION

### A. Enforcement of Arbitration Agreements

We start with the New York Convention referenced in Lindo's Contract. In 1958, the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, more commonly known as the New York Convention. In 1970, the United States acceded to the treaty, which was subsequently implemented by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq.

The Convention requires contracting states, such as the United States, to recognize written arbitration agreements concerning subject matter capable of settlement by arbitration:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

New York Convention, art. II(1) (emphasis added). Both Nicaragua (where Lindo

7

is a citizen) and the Bahamas (whose law Lindo agreed to in his Contract) are also signatories to the Convention.

Section 201 of the FAA provides that the Convention shall be enforced in U.S. courts: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, <u>shall be enforced</u> in United States courts in accordance with this chapter." 9 U.S.C. § 201 (emphasis added); <u>see also</u> <u>Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH</u>, 141 F.3d 1434, 1440 (11th Cir. 1998) ("As an exercise of the Congress' treaty power and as federal law, the Convention must be enforced according to its terms over all prior inconsistent rules of law." (quotation marks omitted)). The Supreme Court has stated that "[t]he goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." <u>Scherk v. Alberto-Culver Co.</u>, 417 U.S. 506, 520 n.15, 94 S. Ct. 2449, 2457 n.15 (1974).

## B. Two Stages of Enforcement

To implement the Convention, Chapter 2 of the FAA provides two causes of action in federal court for a party seeking to enforce arbitration agreements

covered by the Convention: (1) an action to <u>compel arbitration</u> in accord with the terms of the agreement, 9 U.S.C. § 206, and (2) at a later stage, an action to <u>confirm an arbitral award</u> made pursuant to an arbitration agreement, 9 U.S.C. § 207. See <u>Czarina, L.L.C. v. W.F. Poe Syndicate</u>, 358 F.3d 1286, 1290-91 (11th Cir. 2004).

The Convention contains defenses that correspond to the two separate stages of enforcement mentioned above. Article II contains the "null and void" defense, which—like 9 U.S.C. § 206—is directed at courts considering an action or motion to "refer the parties to arbitration":

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, <u>refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed</u>.

New York Convention, art. II(3) (emphasis added). Article II applies at the initial arbitration-enforcement stage. See <u>Bautista v. Star Cruises</u>, 396 F.3d 1289, 1301 (11th Cir. 2005) (stating that "[t]he Convention requires that courts enforce an agreement to arbitrate unless the agreement is 'null and void, inoperative or incapable of being performed'" (quoting New York Convention, art. II(3))).

Article V of the Convention, on the other hand, enumerates seven defenses that—like 9 U.S.C. § 207—are directed at courts considering whether to recognize

9

and enforce an arbitral award. Article V applies at the award-enforcement stage. See New York Convention, art. V (listing seven instances where "[r]ecognition and enforcement of the award may be refused" by "the competent authority where the recognition and enforcement is sought"); see also 9 U.S.C. § 207 (providing "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"). One of Article V's seven defenses is the "public policy" defense, which states:

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
> . . .
> (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, art. V(2). After arbitration, a court may refuse to enforce an arbitral award if the award is contrary to the public policy of the country. Id. The party defending against the enforcement of an arbitral award bears the burden of proof. Imperial Ethiopian Gov't v. Baruch-Foster Corp., 535 F.2d 334, 336 (5th Cir. 1976).[5]

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Importantly, Article II contains no explicit or implicit public policy defense at the initial arbitration-enforcement stage. See New York Convention, art. II. Meanwhile, Article V's public policy defense, by its terms, applies only at the award-enforcement stage. See id. art. V(2) (stating when "[r]ecognition and enforcement of an arbitral award may also be refused").

Both parties agree that the Convention applies to Lindo's Contract. Applying the Convention, the district court recognized and enforced Lindo's agreement to arbitrate his dispute under Bahamian law in the country of his citizenship. On appeal, Lindo argues that his arbitration agreement, by selecting Bahamian law, effectively eliminates his U.S. statutory claim under the Jones Act and is unenforceable under the Convention. Lindo asserts that, despite his agreement binding him to do so, he cannot be required to arbitrate elsewhere under the Convention unless he can pursue a U.S. statutory claim under the Jones Act.

### III. REVIEW OF CASE LAW

The Supreme Court and this Circuit have decided multiple cases enforcing forum-selection and choice-of-law clauses in contracts that require (1) suit or arbitration in a non-American forum, (2) application of non-American law, or (3) a combination thereof. Those cases, discussed below, provide the applicable guidelines for reviewing the choice clauses in Lindo's arbitration agreement.

11

## A.   M/S Bremen v. Zapata Off-Shore Co. (U.S. 1972)

Although not strictly an arbitration case, the Supreme Court's M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907 (1972) ("The Bremen"), held that forum-selection clauses are "prima facie valid."  Id. at 10, 92 S. Ct. at 1913. The Supreme Court disclaimed the "parochial concept that all disputes must be resolved under our laws and in our courts" and cautioned that the United States "cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."  Id. at 9, 92 S. Ct. at 1912-13.

The contract in The Bremen provided that "'[a]ny dispute arising [between the parties] must be treated before the London Court of Justice.'"  Id. at 2, 92 S. Ct. at 1909.  The Supreme Court recognized that English law likely would be applied to adjudicate the claim.  See id. at 13 n.15, 92 S. Ct. at 1915 n.15 (stating "while the contract here did not specifically provide that the substantive law of England should be applied, it is the general rule in English courts that the parties are assumed, absent contrary indication, to have designated the forum with the view that it should apply its own law").  The Court remarked that "the forum clause was also an effort to obtain certainty as to the applicable substantive law."  Id.  Accordingly, the forum-selection clause in The Bremen contained choice-of-

law implications as well—English, not American law, would apply. The Supreme Court announced a strong presumption in favor of enforcing such forum-selection clauses, despite the possibility that a markedly different result would be obtained if the case proceeded in English courts as opposed to American courts.[6]

## B.  Scherk v. Alberto-Culver Co. (U.S. 1974)

Only a few years later, the Supreme Court in Scherk extended these principles to arbitration, reasoning that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."  417 U.S. at 519, 94 S. Ct. at 2457.  Scherk also recognized that U.S. statutory claims are amenable to arbitral resolution—even U.S. statutory claims containing anti-waiver provisions, such as the U.S. securities law barring any provision that requires a security buyer to waive compliance with the Securities Exchange Act of 1934.  Id. at 513, 94 S. Ct. at 2454.

Both the district and circuit courts in Scherk had refused to compel arbitration.  Id. at 510, 94 S. Ct. at 2452-53.  Reversing, the Supreme Court held

_____

[6]Compare The Bremen, 407 U.S. at 8 n.8, 92 S. Ct. at 1912 n.8 (referencing an "undisputed" affidavit of a British solicitor that English courts would find the clauses exculpating the German defendant from liability "'prima facie valid and enforceable'"), with id. at 8 n.9, 92 S. Ct. at 1912 n.9 (noting the Fifth Circuit's suggestion that enforcing the exculpatory clauses would be improper in American courts because doing so "would deny [the American plaintiff] relief to which it was 'entitled'").

that the parties' agreement, calling for arbitration in Paris applying Illinois law, should be "respected and enforced." Id. at 519-20, 94 S. Ct. at 2457. The Court stated that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is[] . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." Id. at 516, 94 S. Ct. at 2455 (emphasis added). The Scherk majority rejected the dissent's insistence that "American standards of fairness" must govern the controversy, commenting that such judicial obstinacy "demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries." Id. at 517 n.11, 94 S. Ct. at 2456 n.11 (quotation marks omitted).

After declaring that the arbitration clause must be "respected and enforced by the federal courts," the Supreme Court's 1974 Scherk decision commented that its holding garnered further support in light of the United States's 1970 accession to the New York Convention and the treaty's subsequent implementation by the FAA. Id. at 519-520 & n.15, 94 S. Ct. at 2457 & n.15. Although declining to decide whether the New York Convention required of its own force the enforcement of the arbitration clause, the Supreme Court proclaimed that the Convention and the FAA "provide strongly persuasive evidence of congressional

policy consistent with the decision we reach today." Id. at 520 n.15, 94 S. Ct. at 2457 n.15.

**C.    Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth (U.S. 1985)**

In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346 (1985), the Supreme Court again enforced an arbitration clause in a sales agreement—this time calling for arbitration in Japan under the rules of the Japan Commercial Arbitration Association—even though a litigant raised U.S. statutory causes of action.

In Mitsubishi, a Japanese car manufacturer (Mitsubishi Motors Corporation) entered into a sales agreement with Soler Chrysler-Plymouth, Inc., a Puerto Rican dealership, for the sale of Mitsubishi-manufactured products. Id. at 616-17, 105 S. Ct. at 3348-49. Mitsubishi sued Soler for payments due and sought to compel arbitration as provided in the sales agreement. Id. at 618-19, 105 S. Ct. at 3349-50. Soler counterclaimed, alleging, inter alia, that Mitsubishi had violated the Sherman Act. Id. at 619-20, 105 S. Ct. at 3350.

In holding that the arbitration agreement was enforceable, the Supreme Court in Mitsubishi stressed the strong presumption favoring the enforcement of arbitration clauses and remarked that "[t]here is no reason to depart from these guidelines where a party bound by an arbitration agreement raises claims founded

15

on statutory rights." Id. at 626, 105 S. Ct. at 3354. The Supreme Court concluded that a party is bound by its agreement to arbitrate U.S. statutory claims unless Congress has precluded arbitration as to that subject matter:

> Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. . . . Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. Nothing, in the meantime, prevents a party from excluding statutory claims from the scope of an agreement to arbitrate.

Id. at 627-28, 105 S. Ct. at 3354-55 (emphasis added).

This is consistent with Article II(1) of the Convention, which states that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences . . . concerning a subject matter capable of settlement by arbitration." New York Convention, art. II(1) (emphasis added). The Mitsubishi Court agreed that Article II(1) "contemplates exceptions to arbitrability grounded in domestic law." 473 U.S. at 639 n.21, 105 S. Ct. at 3360 n.21. In other words, courts may examine, at the arbitration-enforcement stage, whether a type of statutory claim cannot be submitted to arbitration. The Supreme Court stressed, however, that this subject-

16

matter exception is a policy decision to be made by Congress, not courts:

> The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention. But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

Id. (emphasis added).

The Mitsubishi Court rejected the argument that Sherman Act antitrust claims were unsuitable for arbitration. The Supreme Court adverted to its decision in Scherk, concluding that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." Id. at 629, 105 S. Ct. at 3355 (emphasis added). The Mitsubishi Court observed that "The Bremen and Scherk establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions," that this presumption is "reinforced by the emphatic federal policy in favor of arbitral dispute resolution," and that this federal policy "applies with special force in the field of international commerce."

17

Id. at 631, 105 S. Ct. at 3356.

Because the meaning of dicta in Mitsubishi's footnote 19 is so hotly disputed by the parties, we discuss it in detail. In footnote 19, the Supreme Court commented that the United States, acting as amicus curiae, raised the possibility that the Japanese arbitral panel could read the choice-of-law provision to "wholly . . . displace American law," not just as to the interpretation of the contract terms but also where it would otherwise apply. Id. at 637 n.19, 105 S. Ct. at 3359 n.19. Although the arbitration clause provided Swiss law governed the agreement, Mitsubishi conceded in oral argument that American law would apply to the antitrust claims in arbitration. Id. The Supreme Court stated it had "no occasion to speculate on this matter at this stage in the proceedings, when Mitsubishi seeks to enforce the agreement to arbitrate, not to enforce an award." Id. The Supreme Court added there was no need to "consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinitiate suit in federal court." Id. (emphasis added).

In continuing dicta in footnote 19, the Supreme Court "merely note[d]" that in the event the "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against

18

public policy." Id. The Supreme Court's footnote 19 provided no examples of the types of clauses constituting such an impermissible prospective waiver. And to date, the Supreme Court has never invalidated an arbitration agreement under the "prospective waiver" reasoning of footnote 19. Instead, it has compelled arbitration at the initial arbitration-enforcement stage, noting that this "prospective waiver" issue is premature and should instead be resolved at the arbitral award-enforcement stage. See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540-41, 115 S. Ct. 2322, 2329-30 (1995) (concluding, at arbitration-enforcement stage, that ruling on "prospective waiver" question would be "premature" given subsequent opportunity for review at award-enforcement stage); see also 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, __, 129 S. Ct. 1456, 1474 (2009) (stating, at arbitration-enforcement stage, that resolution of the question of a prospective waiver of "federally protected civil rights . . . . at this juncture would be particularly inappropriate in light of our hesitation to invalidate arbitration agreements on the basis of speculation" (citations omitted and emphasis added)).

Notably, Mitsubishi is consistent with the fact that an Article V public policy defense applies at the award-enforcement stage, not the initial arbitration-enforcement stage. Immediately following footnote 19, the text of Mitsubishi

19

discussed how the Court's enforcement of the arbitration clause did not divest federal courts of their authority to review the arbitrators' ultimate decision. 473 U.S. at 636, 105 S. Ct. at 3359-60. At the award-enforcement stage, federal courts retain the ability to review whether the arbitral proceeding paid sufficient heed to a litigant's claims and the public policies underlying them: "Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." Id. at 638, 105 S. Ct. at 3359 (emphasis added).

Additionally, the Mitsubishi Court observed that Article V of the New York Convention "reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the award would be contrary to the public policy of that country.'" Id. (emphasis added) (quoting New York Convention, art. V(2)(b)). Further allaying concerns that such public policy review would occur too late in the process, the Supreme Court stated that although "the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them." Id. at 638, 105 S. Ct. at 3360. In other words, at the arbitral

20

award-enforcement stage, a court can ascertain if the arbitral tribunal recognized the antitrust claims. The Supreme Court gave no indication that an Article V public policy analysis—which by its own terms applies when the "[r]ecognition and enforcement of an arbitral award" is sought, New York Convention art. V(2)—should be conducted prior to the award-enforcement stage.

**D.** **Vimar Seguros y Reaseguros v. M/V Sky Reefer (U.S. 1995)**

Importantly for the issue here, Vimar extended this wait-and-see principle of Mitsubishi even further. In Vimar, a U.S. distributor purchased fruit to be shipped from Morocco in a vessel owned by a Panamanian company and time-chartered to a Japanese company. 515 U.S. at 530, 115 S. Ct. at 2325. Because the fruit cargo was damaged en route, the U.S. distributor and its subrogated marine cargo insurer brought suit in federal district court against the ship in rem and its Panamanian owner in personam, while those defendants sought to compel arbitration. Id. at 531-32, 115 S. Ct. at 2325.

The Supreme Court enforced the arbitration provision providing that disputes "shall be referred to arbitration in Tokyo by the Tokyo Maritime Arbitration Commission" and that the contract "shall be governed by the Japanese law." Id. at 531, 115 S. Ct. at 2325 (quotation marks omitted). The Supreme Court acknowledged that the substantive law prospectively applied in the Japanese

arbitration proceedings could reduce the defendant Panamanian shipping carrier's liability below the U.S. legal guarantees afforded to the American cargo owner under the Carriage of Goods by Sea Act ("COGSA").[7] Id. at 539-40, 115 S. Ct. at 2329.

Specifically, Japanese Hague Rules vested carriers with an additional defense based on the acts or omissions of hired stevedores, whereas the U.S. statute, COGSA, rendered the proper stowage of cargo a nondelegable duty. Id. Echoing Mitsubishi, the Vimar Court stated that "[w]hatever the merits of petitioner's comparative reading of COGSA and its Japanese counterpart, its claim is premature. At this interlocutory stage it is not established what law the arbitrators will apply to petitioner's claims or that petitioner will receive

---

[7]COGSA, now codified as amended in the note following 46 U.S.C. § 30701, "governs the terms of bills of lading issued by ocean carriers engaged in foreign trade." Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. __, 130 S. Ct. 2433, 2440 (2010). COGSA provides that "'[a]ny clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, . . . or lessening such liability . . . shall be null and void and of no effect.'" Vimar, 515 U.S. at 534, 115 S. Ct. at 2326-27 (emphasis added) (quoting COGSA). The plaintiffs in Vimar contended that this provision of COGSA proscribed enforcement of the foreign arbitration clause.

As a preliminary matter, the Supreme Court rejected the plaintiffs' argument that the costs and inconvenience of foreign arbitration necessarily "lessen[ed] . . . liability" in a manner not countenanced by COGSA. The Supreme Court concluded that nothing in COGSA's "lessening such liability" language "prevents the parties from agreeing to enforce [COGSA's] obligations in a particular forum." Id. at 535, 115 S. Ct. at 2327. Relying on the "contemporary principles of international comity and commercial practice" observed in The Bremen, Scherk, and Mitsubishi, the Vimar Court declared that "[i]t would also be out of keeping with the objects of the Convention for the courts of this country to interpret COGSA to disparage the authority or competence of international forums for dispute resolution." Id. at 537-38, 115 S. Ct. at 2328-29.

22

diminished protection as a result." Id. at 540, 115 S. Ct. at 2329 (emphasis

added).

Unlike Mitsubishi, the foreign defendants in Vimar offered no stipulation

that American law would apply to the arbitration proceedings in Japan. The

Vimar Court hypothesized scenarios where the arbitrators could conclude "that

COGSA applies of its own force or that Japanese law does not apply so that, under

another clause of the bill of lading, COGSA controls." Id. Nevertheless, such

speculations were immaterial at this juncture, the Supreme Court reasoned, since

the foreign defendants "seek only to enforce the arbitration agreement" and the

district court "retained jurisdiction over the case and 'will have the opportunity at

the award-enforcement stage to ensure that the legitimate interest in the

enforcement of the . . . laws has been addressed.'" Id. at 540, 115 S. Ct. at

2329-30 (quoting Mitsubishi, 473 U.S. at 638, 105 S. Ct. at 3359). Even though

the bill of lading specified that the contract "shall be governed by the Japanese

law," the Supreme Court concluded it was "correct to reserve judgment on the

choice-of-law question," since this "must be decided in the first instance by the

arbitrator." Id. at 541, 115 S. Ct. at 2330 (quotation marks omitted) (citing

Mitsubishi, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19).

Citing Mitsubishi again, the Supreme Court added a qualifier to the

language in Mitsubishi's footnote 19. Vimar stated that an arbitration agreement could be "'condemn[ed] . . . as against public policy'" if the "'choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies'" and if there were "no subsequent opportunity for review." Id. at 540, 115 S. Ct. at 2330 (emphasis added) (quoting Mitsubishi, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19). Since "the District Court has retained jurisdiction, mere speculation that the foreign arbitrators might apply Japanese law which, depending on the proper construction of COGSA, might reduce respondents' legal obligations, does not in and of itself lessen liability under COGSA . . . ." Id. at 541, 115 S. Ct. at 2330.

Together, these Supreme Court precedents propound several overarching themes: (1) courts should apply a strong presumption in favor of enforcement of arbitration and choice clauses; (2) U.S. statutory claims are arbitrable, unless Congress has specifically legislated otherwise; (3) choice-of-law clauses may be enforced even if the substantive law applied in arbitration potentially provides reduced remedies (or fewer defenses) than those available under U.S. law; and (4) even if a contract expressly says that foreign law governs, as in Vimar, courts should not invalidate an arbitration agreement at the arbitration-enforcement stage on the basis of speculation about what the arbitrator will do, as there will be a later

24

opportunity to review any arbitral award.

**E.** **Lipcon v. Underwriters at Lloyd's, London (11th Cir. 1998)**

Following Supreme Court precedent, as we must, this Court enforced both choice-of-law and forum-selection clauses in Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998), despite the likelihood that the law to be applied in the foreign tribunal would accord the American plaintiffs fewer remedies than would be available under U.S. statutory law. Lipcon is not an arbitration case, and was not subject to the Convention's linking of Article V's public policy defense to the arbitral award-enforcement stage. Aside from the timing feature of when the Convention's public policy defense is raised, Lipcon is highly relevant to footnote 19 in Mitsubishi.

In Lipcon, the plaintiff American investors incurred massive financial losses from certain underwriting transactions. Id. at 1288. The Lipcon case arose from efforts by Lloyd's of London, a large British insurance market, to recruit American investors. Id. Under the contractual arrangement, the American investors would provide underwriting capital in exchange for the right to participate in Lloyd's underwriting agencies. Id. Like The Bremen, the agreements in Lipcon contained choice-of-law and forum-selection clauses providing that "the courts of England shall have exclusive jurisdiction to settle any dispute" and the "rights and

25

obligations of the parties . . . shall be governed by and construed in accordance with the laws of England." Id. (emphasis added and quotation marks omitted). Alleging that the English defendant Lloyd's concealed information, the American investors brought statutory claims in U.S. district court under, inter alia, the Securities Act of 1933 and the Securities Exchange Act of 1934 (collectively, the "U.S. Securities Acts"). Id. at 1288-89.

Among other contentions, the American plaintiffs argued that Mitsubishi's footnote 19 indicated the Supreme Court's "unwillingness to permit choice provisions to eliminate United States statutory remedies." Id. at 1293. This Court in Lipcon rejected this argument and affirmed the district court's enforcement of the English forum and English law clauses, concluding that the forum-selection and choice-of-law clauses "satisfy scrutiny for fundamental fairness and do not contravene public policy." Id. at 1287.

Similar to the Supreme Court's Scherk decision, Lipcon considered whether the anti-waiver provisions of U.S. securities law—which barred any provision requiring a security buyer to waive compliance with the U.S. Securities Acts[8]—voided the choice-of-law and forum-selection clauses at issue. While

_____

[8]The Securities Act of 1933 provides, "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. § 77n. Similarly, the

26

acknowledging that the American plaintiffs' argument "finds strong support in the plain language of the anti-waiver provisions, which facially admit of no exceptions," this Court nonetheless stated that "precedent and policy considerations compel us to conclude that Bremen's framework for evaluating choice clauses in international agreements governs this case." Id. at 1292. The Lipcon Court summarized the "Bremen test" as calling for the enforcement of forum-selection clauses unless:

> (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy.

Id. at 1296. As to the first factor—"fraud or overreaching"—we concluded that the American plaintiffs had not adequately pled fraud. Id.

As to the latter three factors of "the inconvenience or unfairness of the chosen forum," "the fundamental unfairness of the chosen law," and the "contraven[tion] [of] a strong public policy," this Court in Lipcon examined whether the English remedies were inadequate, given that English law contained

Securities Exchange Act of 1934 provides, "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a).

27

no direct analogues to the U.S. Securities Acts. We recounted numerous facets of English securities law which, the American plaintiffs contended, provided for inferior remedies as compared to their U.S. counterparts. Id. at 1297-98. We confessed there was "little doubt that 'the United States securities laws would provide [appellants] with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements.'" Id. at 1297 (quoting Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1366 (2d Cir. 1993)).

In concluding that English law contained "adequate" remedies to withstand a challenge under the Bremen test, this Court declared, "We will not invalidate choice clauses[] . . . simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States." Id. (emphasis added). Rather, choice clauses are unenforceable "only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair."[9] Id. (emphasis added).

Lastly, in Lipcon we were mindful of Mitsubishi's footnote 19 "prospective

---

[9]Lipcon approvingly cited similar conclusions reached by the Second and Tenth Circuits. See Roby, 996 F.2d at 1360-61 ("In the absence of other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992) ("The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair.").

28

waiver" language.  See id. at 1298 (citing Mitsubishi, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19).  The SEC, as amicus curiae, argued that courts which had addressed the issue gave short shrift to the "compensatory function of private actions under the securities laws" by enforcing similar choice clauses.  Id. Although recognizing the value of these private actions, the Lipcon Court opined, "We are more confident than the SEC . . . that the compensatory policy underlying United States securities law will be vindicated by litigation in English courts under English law; this is especially so given our conclusion that English law provides adequate remedies to appellants in this case."  Id. at 1299 (emphasis added). Accordingly, this Court held that the American plaintiffs were bound by the choice clauses and must honor their bargain by bringing their claims in English courts, under English law.  Id.

## F.    Bautista v. Star Cruises (11th Cir. 2005)

Next comes Bautista v. Star Cruises, where this Court compelled arbitration of Jones Act negligence claims in the Philippines and rejected the plaintiff seamen's arguments that the arbitration provision was "unconscionable."  396 F.3d at 1302-03.  In reaching this holding, Bautista followed the clear weight of the Supreme Court's and our Circuit's precedents discussed above.

Bautista involved the explosion of a cruise ship's steam boiler while the

29

vessel was docked in Miami. Id. at 1292. Four injured crewmembers and the personal representatives of six deceased crewmembers—all Filipino citizens, id. at 1294 n.7 (collectively referred to as the "plaintiff seamen")—filed separate complaints in Florida state court against defendant NCL (owner of the ship) and its alleged parent company, Star Cruises. Id. at 1292. Their complaints sought damages for failure to provide maintenance, cure, and unearned wages, and for Jones Act negligence and unseaworthiness. Id.

The defendant NCL removed the case to federal court and sought to compel arbitration in the Philippines pursuant to the seamen's one-page employment agreements. Id. at 1292-93. The employment agreements, along with other facets of the seaman hiring process, were regulated by the Philippine government through the Philippine Overseas Employment Administration ("POEA"). Id. at 1293. The employment agreements incorporated by reference a document containing the arbitration clause, which provided that all claims and disputes arising from employment should be submitted to the National Labor Relations Commission in the Philippines, or to a voluntary arbitrator or panel of arbitrators (presumably also in the Philippines). Id. at 1293 n.5. The district court compelled arbitration in the Philippines and retained jurisdiction to enforce any arbitral award. Id. at 1294.

Following the Convention and precedent, this Court in Bautista recognized that it: (1) conducts only a "very limited inquiry" in deciding a motion to compel arbitration under the Convention, id. (quotation marks omitted), and (2) must be "mindful that the Convention Act 'generally establishes a strong presumption in favor of arbitration of international commercial disputes.'" Id. at 1294-95 (quoting Indus. Risk Insurers, 141 F.3d at 1440). The Bautista Court quoted Mitsubishi's instructions to enforce international arbitration clauses even if a different resolution would be reached in a purely domestic setting. Id. at 1302. We also explained that a court must order arbitration unless (1) the four jurisdictional prerequisites are not met[10] or (2) an affirmative defense under the New York Convention applies. Id. at 1294-95.

After determining that all jurisdictional prerequisites were met, the Bautista Court next considered whether the plaintiff seamen could assert any affirmative defenses under the Convention. We addressed only the defenses in Article II, which provides that arbitration agreements should be enforced unless the

---

[10]The jurisdictional prerequisites mandate that:
(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.
Bautista, 396 F.3d at 1294 n.7.

31

agreement "is null and void, inoperative or incapable of being performed."  New

York Convention, art. II(3).

The plaintiff seamen made two arguments: (1) that the arbitration provision

was "unconscionable" and (2) that the dispute was not arbitrable.[11]  Bautista, 396

F.3d at 1301-02. This Court framed the first argument as implicating Article II's

"null and void" language, whereas the second argument appertained to Article II's

"incapable of being performed" phrasing.  Id.

Importantly, in Bautista we held that Article II's "null and void" clause was

confined to "'standard breach-of-contract defenses'" and that "[t]he limited scope

of the Convention's null and void clause 'must be interpreted to encompass only

those situations—such as fraud, mistake, duress, and waiver—that can be applied

neutrally on an international scale.'"  Id. at 1302 (emphasis added) (quoting

DiMercurio, 202 F.3d at 79-80).  The plaintiff seamen had not claimed fraud,

mistake, duress, or waiver, and thus we enforced their arbitration agreement.  Id.

In rejecting the seamen's asserted defense that their employment contracts

were "unconscionable," this Court in Bautista concluded that economic hardship

---

[11]Bautista also analyzed a separate argument propounded by the plaintiff seamen: that the
FAA exemption for seamen's employment contracts applied to their employment agreements,
thus foreclosing operation of the arbitration provision.  See Bautista, 396 F.3d at 1295-1300.  In
an exercise of statutory interpretation, this Court determined that the plain language of chapter 2
of the FAA barred the plaintiff seamen's attempt to apply the exemption.  Id.  Because Lindo
does not raise this issue on appeal, it is not further addressed here.

and unconscionability arguments are <u>not</u> available defenses under Article II of the Convention. We indicated that "[d]omestic defenses to arbitration are transferrable to a Convention Act case <u>only if they fit within the limited scope of defenses described above</u>." <u>Id.</u> (emphasis added). Since it was "doubtful that there exists a precise, universal definition of the unequal bargaining power defense that may be applied effectively across the range of countries that are parties to the Convention," this Court "decline[d] to formulate one." <u>Id.</u> Although acknowledging that the seamen's penury might lead to a "hard bargain during the hiring process," we pointed out that the Philippines government, operating through POEA, had a role in the hiring process to protect seamen interests. <u>Id.</u> at 1302 n.13.

The <u>Bautista</u> Court next considered whether the plaintiff seamen's claims were even arbitrable in the Philippines. The plaintiff seamen had cited to a Philippine case involving tortious conduct in which the Philippine Supreme Court determined that both the labor arbiter and the national labor relations body lacked jurisdiction to consider the claims. <u>Id.</u> at 1302-03. In the case before it, by contrast, the <u>Bautista</u> Court commented that such preclusion of the claim "is not foreordained." <u>Id.</u> at 1303. This Court noted that "Plaintiffs have options beyond tort claims" and thus the Philippine case did not provide a sufficient basis for

33

concluding that the employment dispute at issue could not be arbitrated in the Philippines. Id.

Having found Article II's "null and void" clause inapplicable and having determined that the arbitration provision was not "incapable of being performed" in the Philippines, the Bautista Court ruled that the district court had properly granted NCL's motion to compel arbitration of the plaintiff seamen's claims—including claims under the Jones Act—in the Philippines. Id.

## G. Thomas v. Carnival Corp. (11th Cir. 2009)

This survey brings us to Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009), where this Court did not enforce a plaintiff's arbitration agreement as to his Seaman's Wage Act claim. The plaintiff in Thomas was the head waiter on defendant Carnival's cruise ship, which flew a Panamanian flag of convenience. Id. at 1115-16. The plaintiff (Thomas) sued Carnival for injuries incurred onboard its ship. Id. at 1115. The complaint alleged Jones Act negligence, unseaworthiness, failure to provide maintenance and cure, and failure to pay wages under the Seaman's Wage Act. Id. As to the place of arbitration, the plaintiff's employment agreement specified that any disputes would be arbitrated in the Philippines. Id. at 1116. As to the choice of law, the law of the vessel's

flag applied in the proceedings (in the plaintiff's case, Panamanian law).[12]  Id. at

1116, 1123.  The district court compelled arbitration in the Philippines.  Id. at

1115.

On appeal, the plaintiff argued that his arbitration clause should not be

enforced because, inter alia, (1) not all the jurisdictional prerequisites for

enforcement were met, and (2) the Convention provides that courts should not

enforce an arbitration clause when doing so "'would be contrary to the public

policy of that country.'"  Id. (quoting New York Convention, art. V(2)(b)).  The

plaintiff argued that the foreign forum would apply Panamanian law, and thus his

arbitration clause operated as a prospective waiver of his U.S. statutory rights, in

contravention of U.S. public policy.  Id.  This Court determined that only the

Seaman's Wage Act claim met the four jurisdictional prerequisites because the

other claims (including Thomas's Jones Act claim) arose before the arbitration

agreement went into effect.[13]  Id. at 1117-20.

In analyzing the plaintiff's affirmative defenses under the Convention, the

Thomas Court cited only to Article V, quoting as follows:

---

[12]There was no indication that the employment contract in Thomas was negotiated by a union, or incorporated by reference a collective bargaining agreement.

[13]The Thomas Court expressly declined to address whether the plaintiff's Jones Act claim was arbitrable, as it did not fall within the scope of the arbitration agreement.  573 F.3d at 1120 n.9.

35

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country.

Id. at 1120 (alteration and omission in original) (quoting New York Convention, art. V(2)(b)). The Thomas Court did not cite Article II anywhere in the opinion. At the conclusion of the opinion, however, Thomas declared, "[W]e find the Arbitration Clause requiring arbitration in the Philippines under Panamanian law null and void as it relates to Thomas's Seaman's Wage Act Claim." Id. at 1124 (emphasis added). In a footnote appended thereto, Thomas stated, "[T]he narrow holding is that the Convention does govern but, applying its affirmative defenses provision, we find that the particular arbitration clause in question is null and void as a matter of public policy." Id. at 1124 n.17 (third emphasis added). Thus, although Thomas does not cite Article II, it does twice use the term "null and void," which is an Article II defense.

Thomas crafted a new public policy defense, providing that arbitration is unenforceable if foreign law applies because the plaintiff cannot assert U.S. statutory claims. The Thomas Court distinguished its case from Mitsubishi and Vimar on the basis that Thomas's arbitration agreement provided that Panamanian law would apply. The Thomas Court stated that—unlike a situation where

36

American law would affirmatively be applied in an arbitration setting (Mitsubishi) or at least potentially applied and subject to later review by U.S. courts (Vimar)—"[i]n the case before us . . . it is undisputed that, regardless of the procedural posture of the case, U.S. law will never be applied in resolving the resolution of Thomas's claims."  Id. at 1122-23.

The Thomas Court offered its own characterization of the Mitsubishi and Vimar decisions: "The [Supreme] Court, then, has held that arbitration clauses should be upheld if it is evident that either U.S. law definitely will be applied [(Mitsubishi)] or if, [sic] there is a possibility that it might apply and there will be later review [(Vimar)]."[14]  Id. at 1123.  The Thomas Court concluded that "[t]he arbitration clauses that provided the bases for these holdings are in direct contradistinction to the Arbitration Clause in [Thomas's] case, which specifies ex ante that only foreign law would apply in arbitration.  There is no uncertainty as to the governing law in these proposed arbitral proceedings—only Panamanian law will be applied."  Id.

The Thomas Court opined that there was "no assurance of an 'opportunity

_____

[14]The Thomas Court quoted Mitsubishi's footnote 19 dicta, stating that if "'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy.'"  Thomas, 573 F.3d at 1121 (quoting Mitsubishi, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19).

37

for review'" after the arbitration process concluded, since "the possibility of any later opportunity presupposes that arbitration will produce <u>some</u> award which the plaintiff can seek to enforce." Id. In this regard, the <u>Thomas</u> Court stated that (1) "Thomas would only be arbitrating a single issue—the Seaman's Wage Act claim, one derived solely from a U.S. statutory scheme"; (2) "If, applying Panamanian law, Thomas receives no award in the arbitral forum—a distinct possibility given the U.S. based nature of his claim—he will have nothing to enforce in U.S. courts"; and, therefore, (3) U.S. courts "will be deprived of any later opportunity to review." Id. at 1123-24.

The <u>Thomas</u> Court pronounced that this possibility of no subsequent court review "would counsel against being deferential in this circumstance." Id. at 1124. Consequently, the <u>Thomas</u> Court applied no deference and refused to compel arbitration as to the plaintiff's Seaman's Wage Act claim. Id. Thomas thus concluded that arbitration agreements that select any law other than U.S. law are unenforceable under the Convention because they eliminate a plaintiff's U.S. statutory claims <u>and</u> a plaintiff may possibly receive no award, precluding later court review.

## IV. ANALYSIS

After reviewing the Convention and Supreme Court and Circuit precedent,

38

we conclude that, at this initial arbitration-enforcement stage, the district court properly enforced Lindo's arbitration agreement in his Contract, which provided that his Jones Act claim would be arbitrated in a foreign forum (his own country of citizenship) under Bahamian law. We list the reasons why.[15]

## A. Strong Presumption of Arbitration Clause Enforcement

First, under the Convention and Supreme Court and Circuit precedent, there is a strong presumption in favor of freely-negotiated contractual choice-of-law and forum-selection provisions, and this presumption applies with special force in the field of international commerce. See Vimar, 515 U.S. at 537-38, 115 S. Ct. at 2328-29; Mitsubishi, 473 U.S. at 631, 105 S. Ct. at 3356; Scherk, 417 U.S. at 516-17, 94 S. Ct. at 2455-56; The Bremen, 407 U.S. at 15-16, 91 S. Ct. at 1916; Bautista, 396 F.3d at 1295; Lipcon, 148 F.3d at 1292-94.

Indeed, the Convention provides that contracting states "shall recognize" written agreements wherein parties agree to submit any and all disputes to settlement by arbitration. New York Convention, art. II(1). This Circuit has stated, in agreement with other circuits, that "a court conducts a very limited inquiry" when "deciding a motion to compel arbitration under the Convention

---

[15]"We review de novo the district court's order to compel arbitration." Bautista, 396 F.3d at 1294.

Act." Bautista, 396 F.3d at 1294 (quotation marks omitted). Therefore, we necessarily start our analysis with a strong presumption in favor of the arbitration agreement in Lindo's Contract and, in fact, must view the choice clauses in Lindo's Contract as prima facie valid and enforceable.

## B. U.S. Statutory Claims Are Arbitrable

Second, both the Supreme Court's and our Circuit's precedents have squarely held that contracts providing for arbitration of U.S. statutory claims are enforceable, absent a contrary intention clearly and specifically expressed by Congress. Vimar, 515 U.S. at 540-41, 115 S. Ct. at 2329-30 (holding COGSA claim arbitrable); Mitsubishi, 473 U.S. at 626-28, 640, 105 S. Ct. at 3354-55, 3360-61 (holding Sherman Act claim arbitrable); Scherk, 417 U.S. at 519-21, 94 S. Ct. at 2457-58 (holding Securities Exchange Act claim arbitrable); Bautista, 396 F.3d at 1303 (holding Jones Act claim arbitrable). The fact that Lindo asserts a statutory Jones Act claim does not affect the strong presumption in favor of enforcement of the choice clauses in his Contract. See Mitsubishi, 473 U.S. at 626, 105 S. Ct. at 3354 (stating "[t]here is no reason to depart from" the strong presumption of enforceability "where a party bound by an arbitration agreement raises claims founded on statutory rights").

Because choice clauses encompassing U.S. statutory claims are enforceable,

Lindo argues that his arbitration clause cannot be enforced (1) because it eliminates his Jones Act claim and (2) due to the unequal bargaining positions of Lindo and NCL.[16]

**C.      Article II: "Null and Void" Defense at Arbitration-Enforcement Stage**

Lindo's contentions are fundamentally flawed for several reasons.  As a signatory to the Convention, the United States, and in turn U.S. courts, must recognize arbitration agreements so long as (1) the four jurisdictional prerequisites are met[17] and (2) no available affirmative defense under the Convention applies. See Bautista, 396 F.3d at 1294-95.

At the arbitration-enforcement stage, Article II(3) of the Convention recognizes only these affirmative defenses to that mandatory recognition: "The court of a Contracting State . . . shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."  New York Convention, art. II(3) (emphasis added).

In Bautista, this Court held that an arbitration agreement is "null and void" under Article II(3) of the Convention only where it is obtained through those

---

[16]We take these contentions from Lindo's "Statement of Issues" in his opening brief on appeal.  See Appellant's Br. at 1.

[17]On appeal, Lindo challenges none of these jurisdictional prerequisites.

41

limited situations, "such as fraud, mistake, duress, and waiver," constituting "standard breach-of-contract defenses" that "can be applied neutrally on an international scale." 396 F.3d at 1302 (quotation marks omitted). Lindo's Contract incorporates a union-negotiated CBA, and there is no claim—much less any showing—of fraud, mistake, duress, or waiver. To the extent Lindo relies on Article II, his claim fails.

Lindo argues that the arbitration provision is unconscionable, maintaining that he signed the Contract on a "take-it-or-leave-the-ship" basis. However, this was the same argument asserted by the plaintiff seamen in Bautista. See id. (stating that plaintiffs argued "crewmembers were put in a difficult 'take it or leave it' situation when presented with the terms of employment" which allegedly "render[ed] the resulting agreements unconscionable"). This Court expressly rejected that argument, concluding that an unconscionability defense was not available under Article II of the Convention. See id. ("It is doubtful that there exists a precise, universal definition of the unequal bargaining power defense that may be applied effectively across the range of countries that are parties to the Convention, and absent any indication to the contrary, we decline to formulate one.").

In an attempt to dismiss binding prior precedent, the dissent criticizes

42

Bautista. Yet, Bautista's articulation of the narrow scope of the "null and void" clause is in complete accord with the prevailing authority in other circuits.[18] See, e.g., DiMercurio, 202 F.3d at 79 (stating that the "null and void" clause "limits the bases upon which an international arbitration agreement may be challenged to standard breach-of-contract defenses" (emphasis added)); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 960 (10th Cir. 1992) (agreeing that "the 'null and void' exception in the Convention is to be narrowly construed" and rejecting public policy defense at arbitration-enforcement stage (citing Scherk and Article V(2)(b)'s application at award-enforcement stage)); Ledee v. Ceramiche Ragno, 684 F.2d 184, 187 (1st Cir. 1982) (rejecting the notion that a public policy defense was available under the "null and void" clause because "an expansive interpretation of the clause would be antithetical to the goals of the Convention" and "not even the parochial interests of the nation may be the measure of [its]

_____

[18]The dissent cites one circuit case suggesting that the "null and void" clause could also encompass a public policy defense. See Rhone Mediterranee Compagnia Francese di Assicurazioni E Riassicurazoni v. Lauro, 712 F.2d 50, 53 (3d Cir. 1983) (stating that "an agreement to arbitrate is 'null and void' only (1) when it is subject to an internationally recognized defense such as duress, mistake, fraud, or waiver . . . or (2) when it contravenes fundamental policies of the forum state"). Yet, even that court stated that "[t]he 'null and void' language must be read narrowly." Id. And despite first referencing "fundamental policies of the forum state," that court went on to state that "signatory nations have effectively declared a joint policy that presumes the enforceability of agreements to arbitrate. Neither the parochial interests of the forum state, nor those of states having more significant relationships with the dispute, should be permitted to supersede that presumption. The policy of the Convention is best served by an approach which leads to upholding agreements to arbitrate." Id. at 54 (emphasis added). Accordingly, the court enforced the arbitration agreement.

43

interpretation"); I.T.A.D. Assocs., Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir. 1981) ("[O]ur interpretation of the Article II(3) proviso must not only observe the strong policy favoring arbitration, but must also foster the adoption of standards which can be uniformly applied on an international scale." (emphasis added)); McCreary Tire & Rubber Co. v. CEAT S.p.A., 501 F.2d 1032, 1037 (3d Cir. 1974) ("There is nothing discretionary about article II(3) of the Convention.").[19]

## D.    Thomas Does Not Aid Lindo

Because Lindo relies heavily on Thomas, we explain at length why Thomas does not help him.

As a preliminary matter, we note that it is difficult to ascertain whether Thomas is an Article II or Article V case. As mentioned above, Thomas never cited Article II but instead cited and quoted Article V, which contains the "contrary to . . . public policy" defense. See New York Convention, art. V(2)(b). However, Thomas does twice employ Article II's "null and void" language. See 573 F.3d at 1124 & n.17. To the extent Thomas was applying Article II, Thomas failed to follow our precedent in the Article II case of Bautista.

---

[19]Even Justice Stevens, whose dissenting opinion in Mitsubishi argued unsuccessfully for "reading Articles II and V together" to enable a public policy defense at the arbitration-enforcement stage, acknowledged the limited scope of the "null and void" clause. See 473 U.S. at 659-60, 105 S. Ct. at 3370-71 (Stevens, J., dissenting). Specifically, Justice Stevens stated that the "null and void" clause referred "to matters of fraud, mistake, and duress in the inducement, or problems of procedural fairness and feasibility." Id. at 659, 105 S. Ct. at 3370.

First, Thomas did not cite or acknowledge Bautista's governing principles: (1) courts conduct a "very limited inquiry" in deciding a motion to compel arbitration, and (2) there is a "strong presumption" in favor of arbitration.[20] Bautista, 396 F.3d at 1294-95 (quotation marks omitted).

Second, and more importantly, Thomas failed to follow Bautista's holding that limited the "null and void" clause's application to "only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." Id. at 1302 (quotation marks omitted). Thomas's creation of a new public policy defense under Article II—based on the elimination of a U.S. statutory claim under the Seaman's Wage Act—by definition cannot be applied "neutrally on an international scale," as each nation operates under different statutory laws and pursues different policy concerns. Thomas wholly failed to subject Thomas's public policy claim to Bautista's test for "null and void" defenses available under Article II. Compare Thomas, 573 F.3d at 1120-24, with Bautista, 396 F.3d at 1302. Thus, to the extent Thomas allowed the plaintiff seaman to prevail on a new public policy defense under Article II,

_____

[20]Despite Bautista's significant relevance, Thomas cites Bautista only for: (1) de novo review; (2) the four jurisdictional prerequisites; and (3) the fact that seaman employment contracts are considered commercial under the Convention. Thomas, 573 F.3d at 1117 (citing Bautista, 396 F.3d at 1294-96).

Thomas violates Bautista and our prior panel precedent rule.  See United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997) ("Under the prior panel precedent rule, we are bound by earlier panel holdings . . . unless and until they are overruled en banc or by the Supreme Court.").

We further note that Thomas's use of Mitsubishi's footnote 19 does not eliminate its conflict with Bautista.  Thomas quoted the "prospective waiver" language in Mitsubishi's footnote 19.  See Thomas, 573 F.3d at 1121 (quoting Mitsubishi, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19).  Thomas itself reads as though footnote 19 is Mitsubishi's holding.[21]  Yet, footnote 19 is undisputably dicta,[22] and the Supreme Court has never once invalidated an arbitration agreement on that basis.  Meanwhile, the governing principles in Mitsubishi are not even mentioned in Thomas.  For example, Mitsubishi articulated that (1) "The Bremen and Scherk establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions"; (2) this presumption is

---

[21]See Thomas, 573 F.3d at 1123 (stating that Supreme Court "has held that arbitration clauses should be upheld if it is evident that either U.S. law definitely will be applied or if, [sic] there is a possibility that it might apply and there will be later review." (first emphasis added)); id. (stating that "[t]he arbitration clauses that provided the bases for these holdings [in Mitsubishi and Vimar] are in direct contradistinction to the Arbitration Clause in [Thomas's] case, which specifies ex ante that only foreign law would apply in arbitration" (first emphasis added)).

[22]See also Shell v. R.W. Sturge, Ltd., 55 F.3d 1227, 1230 (6th Cir. 1995) (characterizing Mitsubishi's footnote 19 as dicta); Bonny v. Society of Lloyd's, 3 F.3d 156, 159 (7th Cir. 1993) (same); Roby, 996 F.2d at 1364 (same).

46

"reinforced by the emphatic federal policy in favor of arbitral dispute resolution"; (3) this federal policy "applies with special force in the field of international commerce"; and (4) U.S. statutory claims—including the Sherman Act claims at issue in Mitsubishi—are subject to the same pro-arbitration presumptions, absent contrary congressional intent. Mitsubishi, 473 U.S. at 626-28, 631, 105 S. Ct. at 3354-56. Thomas disregarded these principles.

Thomas also did not heed Vimar's admonition that courts should not speculate about arbitration outcomes at the initial arbitration-enforcement stage. Unlike in Mitsubishi, the parties in Vimar at no point stipulated that U.S. law would ever apply. Although Japanese law would likely lessen the Vimar defendants' liability below that mandated by U.S. statutory law, the Supreme Court stated that such arguments were "premature," since "[a]t this interlocutory stage it is not established what law the arbitrators will apply to petitioner's claims or that petitioner will receive diminished protection as a result." 515 U.S. at 540, 115 S. Ct. at 2329.

Thomas dismissed Vimar by stating that "it is undisputed that, regardless of the procedural posture of the case, U.S. law will never be applied in resolving the resolution of Thomas's claims." Thomas, 573 F.3d at 1122-23. Thomas ignored Vimar's conclusion that at the interlocutory arbitration-enforcement stage it is not

47

established, even if U.S. law is not applied, what law the arbitrator may apply or that the plaintiff will receive "diminished protection as a result." Vimar, 515 U.S. at 540, 115 S. Ct. at 2329. There was no analysis in Thomas of what remedies Panamanian law provided. The significance of Vimar is that, at the arbitration-enforcement stage, it is generally premature to make findings about how arbitrators will conduct the arbitral process, whether a claim will be heard, or whether the foreign-law remedies will be adequate or inadequate.

Additionally, the Vimar Court emphasized that there would be "subsequent opportunity for review" to ensure that public policy interests have been adequately addressed. Id. at 540, 115 S. Ct. at 2330. In dismissing Vimar again, Thomas contended that "there is no assurance of an 'opportunity for review' of Thomas's Seaman's Wage Act claim" because "the possibility of any later opportunity presupposes that arbitration will produce some award which the plaintiff can seek to enforce." Thomas, 573 F.3d at 1123. Yet Thomas did not indicate why Vimar's statement—that the district court would have jurisdiction at the award-enforcement stage to review the arbitration proceedings—did not equally apply in Thomas. The prospect of an arbitral tribunal awarding no damages in Vimar was

just as conceivable as it was in <u>Thomas</u>.[23]  In every arbitration case, there is a prospect of no award.

Given that <u>Vimar</u> wholly refutes the logic of <u>Thomas</u> on this point, the dissent attempts to distinguish <u>Vimar</u>, contending that its "subsequent opportunity for review" statement somehow does not apply if a district court has not expressly retained jurisdiction (as in Lindo's case).  The Supreme Court has nowhere hinted that a district court need do so, however.  This is not surprising, as an action to confirm an arbitral award may be brought as a <u>separate action</u> under federal law. <u>Compare</u> 9 U.S.C. § 207, <u>with</u> 9 U.S.C. § 206; <u>see also id.</u> § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . <u>shall have original jurisdiction </u>over such an action or proceeding, regardless of the amount in controversy." (emphasis added)).  Indeed, in <u>Mitsubishi</u> the Supreme Court indicated that various federal courts might have jurisdiction in a subsequent action to enforce an arbitral award, not merely the court that compelled arbitration at the Article II stage.  <u>See</u> 473 U.S. at 638, 105 S. Ct. at 3359 ("Having permitted

---

[23]For example, even if a zero-dollar arbitral award is entered, when a defendant seeks to have the zero-dollar arbitral award recognized and enforced by the district court against the plaintiff, the district court then would be able to perform an Article V analysis and either enforce the award or refuse enforcement based on an available Article V affirmative defense under the Convention, including public policy.

the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." (emphasis added)); see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 29 F.3d 727, 733 (1st Cir. 1994) (stating that "unlike a foreign forum selection clause, an agreement to arbitrate does not deprive a federal court of its jurisdiction over the underlying dispute"), aff'd, 515 U.S. 528, 115 S. Ct. 2322.[24]

For all of these reasons, we conclude that Thomas does not aid Plaintiff Lindo at this Article II arbitration-enforcement stage.

## E.     Article V: Public Policy Defense at Arbitral Award-Enforcement Stage

Nevertheless, Lindo argues that his arbitration agreement is "contrary to the public policy" of the United States under Article V. Lindo cites Thomas for this Article V argument, too.

The first problem for Lindo is that Article V applies only at the arbitral

---

[24]Contrary to the dissent's assertion, Justice O'Connor's concurring opinion in Vimar actually confirms this point. See 515 U.S. at 542, 115 S.Ct. at 2330 (O'Connor, J., concurring) (stating that "[f]oreign arbitration clauses of the kind presented here do not divest domestic courts of jurisdiction, unlike true foreign forum selection clauses" (emphasis added)). Justice O'Connor further pronounced that this distinction between foreign forum selection clauses and foreign arbitration clauses "is an important one—it is, after all, what leads the Court to dismiss much of petitioner's argument as premature." Id. Here, of course, we are faced with a foreign arbitration clause and not a foreign forum selection clause. As in Vimar, Lindo may raise a public policy defense at the award-enforcement stage, as the Convention expressly provides.

50

award-enforcement stage and not at the arbitration-enforcement stage at issue here. Article V expressly provides, "Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country." New York Convention, art. V(2) (emphasis added). Yet, Article V has no application in the interlocutory procedural posture of this case, where NCL seeks to enforce arbitration at the outset of the dispute.[25]

In the two instances the Supreme Court has quoted the language of Article

---

[25]The dissent attempts to sidestep the plain import of this language by suggesting that Article II did not include Article V's public policy language because the delegates were in a hurry when drafting the Convention. The first problem is that such a reading flouts clear canons of construction. See, e.g., Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."); cf. United States v. Bean, 537 U.S. 71, 76 n.4, 123 S. Ct. 584, 587 n.4 (2002) ("'The use of different words within related statutes generally implies that different meanings were intended.'" (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 46.06, at 194 (6th ed. 2000))); United States v. Williams, 340 F.3d 1231, 1236 (11th Cir. 2003) (quoting same).

The second problem is that, as indicated by the dissent's own cited sources, the Convention's delegates actually considered a proposal to insert language linking arbitration agreements to the award-enforcement stage—and thus, Article V's public policy defense—but this proposal was voted down. See Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1063 (1961); G. W. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference 27-28 (1958).

V's public policy defense, it has indicated that it is to be applied at the award-enforcement stage, not at the arbitration-enforcement stage.  For instance, in Scherk the Supreme Court declined to consider the plaintiff's fraudulent representation claims at the arbitration-enforcement stage, but stated that "presumably [those claims] could be raised, under Art. V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, in challenging the enforcement of whatever arbitral award is produced through arbitration."  417 U.S. at 519 n.14, 94 S. Ct. at 2457 n.14.

Similarly, and as noted before, in Mitsubishi the Supreme Court stated: "Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." 473 U.S. at 638, 105 S. Ct. at 3359 (emphasis added).  On this point, the Mitsubishi Court continued: "The Convention reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the award would be contrary to the public policy of that country.'" Id. at 638, 105 S. Ct. at 3359-60 (quoting New York Convention, art. V(2)(b), and citing Scherk, 417 U.S. at 519 n.14, 94 S. Ct. at 2457 n.14) (emphasis added).

This Circuit has also uniformly cited or discussed Article II at the

arbitration-enforcement stage and Article V at the award-enforcement stage. Compare Bautista, 396 F.3d at 1301-02 (analyzing Article II "null and void" defense at arbitration-enforcement stage), and Lobo v. Celebrity Cruises, Inc., 488 F.3d 891, 894-96 (11th Cir. 2007) (citing and quoting Article II in the procedural posture of an arbitration-enforcement case), with Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 533 F.3d 1349, 1350-53 (11th Cir. 2008) (noting Article V gives courts discretion to refuse enforcement of an award only after one of Article V's defenses has been shown), Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 377 F.3d 1164, 1166-72 (11th Cir. 2004) (in an earlier appeal, remanding case to district court for consideration of defense under Article V at award-enforcement stage), Czarina, L.L.C., 358 F.3d at 1291, 1292 n.3 (noting that "Article II of the Convention imposes a prerequisite on a party asking the court to compel arbitration" and later commenting that Article V enumerates affirmative defenses to an action confirming an award), Indus. Risk Insurers, 141 F.3d at 1441-46 (analyzing defenses raised under Article V at award-enforcement stage), and Imperial Ethiopian Gov't, 535 F.2d at 335-37 & n.1 (analyzing Article V defense at award-enforcement stage). Thomas is a clear departure from these

53

precedents, too.[26]

Given the lack of case law supporting the dissent's position on this public policy "timing" question (and despite the plain text of Articles II and V), the dissent relies instead on a hodgepodge of alternative sources, including a New York Convention delegate account, law review articles, and a State Department memorandum.[27] Of course, these sources do not propound any new arguments. Rather, they are the same arguments—derived from the very same sources—relied upon in dissenting opinions in Scherk and Mitsubishi, along with an overturned lower court decision. See generally Mitsubishi, 473 U.S. at 659-60, 105 S. Ct. at 3370-71 (Stevens, J., dissenting); Scherk, 417 U.S. at 530 & n.10, 94 S. Ct. at 2463 & n.10 (Douglas, J., dissenting); Mitsubishi Motors Corp. v. Soler

---

[26]On the face of Thomas, we see no challenge to the timing of the application of Article V. Here, by contrast, NCL expressly argues: (1) "the Convention's Articles II and V do not permit a court to invalidate an arbitration provision ab initio on public policy grounds"; (2) Article II "does not provide or allow for the invalidation of an agreement to arbitrate based on 'public policy'"; and (3) "The public policy defense in Article V applies only to challenge the enforcement of an arbitral award." Appellee's Br. at 9.

[27]For instance, the dissent cites a footnote in a 1961 law review article, which speculated that the "null and void" clause could potentially allow forum states to entertain public policy arguments at the arbitration-enforcement stage. See Quigley, supra note 25, at 1064 n.71 (1961). In the same paragraph to which this footnote is appended, Quigley states that, in applying the "null and void" clause, "[p]resumably, the law specified by the parties in their agreement should govern." Id. at 1064. This would entail, in Lindo's case, that Bahamian law would determine whether the arbitration agreement is "null and void." This is a result for which no party contends and which no case law supports. It also reveals the problems inherent in relying upon dated secondary sources as opposed to the plain language of the Convention and binding precedent.

54

Chrysler-Plymouth, 723 F.2d 155, 164-66 (1st Cir. 1983), rev'd in relevant part by

Mitsubishi, 473 U.S. 614, 105 S. Ct. 3346. The Supreme Court rejected those

arguments then, and we must do so here as well.[28]

For all the foregoing reasons, we hold that Lindo cannot raise an Article V

public policy defense at this initial arbitration-enforcement stage.

**F.      Lindo's Public Policy Defense Lacks Merit at This Stage Anyway**

---

[28]Even if we were to rely on these secondary sources—and thus wholly ignore the plain text of the Convention and Supreme Court and Circuit precedents—the dissent's argument still founders. For example, as even the dissent in Scherk acknowledged, G. W. Haight's summary of the New York Convention's proceedings revealed that the delegates considered—but rejected—a proposal to link Article V's public policy defense to Article II's arbitration-enforcement stage:

> When Art. II (3) was being discussed, the Israeli delegate pointed out that while a court could, under the draft Convention as it then stood, refuse enforcement of an award which was incompatible with public policy, "'the court had to refer parties to arbitration whether or not such reference was lawful or incompatible with public policy.'" Id., at 27. The German delegate observed that this difficulty arose from the omission in Art. II (3) "'of any words which would relate the arbitral agreement to an arbitral award capable of enforcement under the convention.'" Ibid.
> Haight continues:
> "When the German proposal was put to a vote, it failed to obtain a two-thirds majority (13 to 9) and the Article was thus adopted without any words linking agreements to the awards enforceable under the Convention. Nor was this omission corrected in the Report of the Drafting Committee (L.61) . . . ."

Scherk, 417 U.S. at 530 n.10, 94 S. Ct. at 2462 n.10 (Douglas, J., dissenting) (quoting G. W. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference). The Scherk dissent went on to say that, in Haight's opinion, courts "'may be allowed some latitude'" and "'find an agreement incapable of performance if it offends the law or the public policy of the forum.'" Id. (quoting Haight) (emphasis omitted). However, Haight considered this a "'limited opening,'" apart from which "'the Conference appeared unwilling to qualify the broad undertaking not only to recognize but also to give effect to arbitral agreements.'" Id. (quoting Haight). Of course, this weak support represents the opinion of a lone delegate, and is clearly not controlling law—particularly since it was not adopted by the Scherk majority. And even under Haight's interpretation, a public policy exception would not apply to Article II(3)'s "null and void" language, but rather to its "incapable of performance" language, which courts have treated separately.

Alternatively, even assuming, _arguendo_, that this timing infirmity were immaterial and Lindo could somehow raise an Article V public policy defense at the arbitration-enforcement stage, Lindo's challenge to his arbitration agreement still fails.

First, Lindo once again relies on _Thomas_ for his public policy argument. Yet, _Thomas_ conflicts with this Circuit's earlier precedent in _Lipcon_,[29] which _Thomas_ does not cite or discuss. Like _Thomas_, _Lipcon_ involved (1) an agreement containing both choice-of-law and forum-selection clauses, which called for a dispute to be heard in a foreign forum under foreign law; (2) plaintiffs asserting U.S. statutory claims; and (3) plaintiffs claiming their choice clauses violated U.S. public policy and should not be enforced. _Lipcon_, 148 F.3d at 1288-89, 1298-99. In _Lipcon_, even though the plaintiffs asserted U.S. statutory securities claims, this Court enforced the choice-of-law clause where English law provided less favorable remedies than the U.S. Securities Acts. _Id._ at 1297-98. _Lipcon_ concluded that choice-of-law clauses are unenforceable "only when the remedies available in the chosen forum are so inadequate that enforcement would be

---

[29]Because _Lipcon_ was not a Convention case, there was no timing issue respecting the public policy defense. Thus, it is particularly relevant on this point, where we assume for the sake of argument that Lindo could somehow raise a public policy argument at the Article II arbitration-enforcement stage.

fundamentally unfair." Id. at 1297.

By contrast, Thomas contains no mention of Panamanian law, much less an analysis of whether the Panamanian remedies would be so inadequate as to be fundamentally unfair. Lipcon explicitly rejected the type of public policy defense asserted in Thomas—i.e., that choice-of-law clauses cannot be enforced when doing so could deprive the plaintiff of the full panoply of remedies provided by a U.S. statute. See id. ("We will not invalidate choice clauses, however, simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States.").

Although public policy interests underlie the Seaman's Wage Act claims in Thomas, the public policy interests underlying the U.S. statutory claims in Lipcon—namely, some of the most crucial components of United States securities laws—are at least as important. Lipcon closely resembles the public policy issue in Thomas—less favorable treatment in a foreign forum under foreign law. To the extent Thomas is an Article V case, Thomas wholly fails to take into account our earlier precedent in Lipcon.

Second, even aside from Thomas, Lindo's challenge to his arbitration agreement fails because (1) Bahamian law itself recognizes negligence actions; and (2) even if, as Lindo claims, U.S. law under the Jones Act has a more relaxed

57

causation standard for negligence claims than Bahamian law, these were precisely the same arguments lodged (and rejected) in Lipcon.

Lipcon acknowledged that "the United States securities laws would provide [the American plaintiffs] with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements." Id. (quotation marks omitted). Nevertheless, this Court held that the choice-of-law and forum-selection clauses were enforceable and ordered the matter to be heard in English courts under English law, since "we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair."[30] Id.

In Lindo's case, the arbitration clause, if anything, is fundamentally fair for several reasons. For starters, the clause is part of a union-negotiated collective bargaining agreement. The fact that the Jones Act claim was expressly referenced in that CBA is clear indication that this type of claim was expressly considered during the negotiation process. Lindo cannot obtain the advantages of his union-negotiated Contract, while rejecting what he now perceives as its disadvantages.

---

[30]Lipcon stated that it took cognizance of the "prospective waiver" language of Mitsubishi's footnote 19, but nevertheless concluded that "enforcement of the [defendant] Lloyd's choice clauses does not contravene public policy." Lipcon, 148 F.3d at 1298. The Lipcon Court even upheld the choice clauses despite the fact that the U.S. Securities Acts contained anti-waiver provisions, which barred any contractual provision requiring a security buyer to waive compliance with the U.S. Securities Acts. Id.

This union-negotiated agreement is enforceable and valid even if it waives Lindo's U.S. statutory claim under the Jones Act.

Additionally, Lindo has not shown that international arbitration under Bahamian negligence law will provide an inadequate remedy. In this regard, we note that NCL filed the affidavit of Bahamian attorney Stephen A. Turnquest, who averred that, under Bahamian law, a plaintiff seaman injured by an employer's breach of duty may sue in negligence and recover damages for pain and suffering, loss of wages and future earnings, and medical expenses. Moreover, a seaman may recover aggravated damages or punitive damages—damages that may be unavailable in strict Jones Act cases. And while Lindo submitted the affidavit of a Bahamian lawyer describing the lighter causation requirements under the Jones Act as compared to Bahamian law,[31] Lindo's expert did not tie this causation issue to the facts of Lindo's case and explain what, if any, impact it could have on his ability to recover. At a minimum, Lindo has not shown that his remedies are inadequate, much less overcome the strong presumption of enforcement of his arbitration clause.

---

[31]Lindo filed the affidavit of Bahamian attorney Monique Vanessa Ann Gomez, who averred that "under Bahamian law there has to be a direct causal link between the breach and the injury complained of. The burden of proof in negligence is on a balance of probabilities and there is no relaxation of the causation element under Bahamian Law." Thus, Gomez stated that the causation burden of proof is reduced under the Jones Act as compared to analogous negligence claims under Bahamian law.

This case exemplifies why the public policy defense of Article V may be raised only at the arbitral award-enforcement stage.  Similar to Vimar, the arbitrator at that time will have ruled and the record will show what legal principles were applied and what Lindo recovered, or did not recover, and why.  Lindo's public policy defense is "premature" at this initial arbitration-enforcement stage.  See Vimar, 515 U.S. at 540-41, 115 S. Ct. at 2329-30; Mitsubishi, 473 U.S. at 638, 105 S. Ct. at 3359-60.

Lastly, Lindo's position would effectively eviscerate the mutually binding nature of the Convention.  Lindo maintains that his arbitration agreement is void as against public policy because he cannot assert his U.S. statutory rights under Bahamian law.  By this logic, courts in other nations could likewise refuse to recognize valid, mutually agreed-upon arbitration provisions if they contemplated the application of American law, in derogation of home-based statutory remedies.  Yet if every country refused to recognize arbitration agreements that contemplate the application of foreign law, the multilateral commitment of the Convention would be defeated.  See Mitsubishi, 473 U.S. at 639 n.21, 105 S. Ct. at 3360 n.21 ("The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own.").

In Vimar, the Supreme Court stated it was imperative that U.S. courts abide by the treaty obligations under the New York Convention: "If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements." 515 U.S. at 539, 115 S. Ct. at 2329.

As the Supreme Court observed in Scherk, "[T]he delegates to the Convention voiced frequent concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." 417 U.S. at 520 n.15, 94 S. Ct. at 2457 n.15. This Court in Lobo noted that the Scherk Court considered the Convention to be "'strongly persuasive evidence of congressional policy' in favor of uniform enforcement of arbitration agreements, despite the potential presence of parochial policies present in other parts of the U.S. Code. Thus, to nullify the arbitration provision here would hinder the purpose of the Convention and subvert congressional intent." Lobo, 488 F.3d at 896 (citation omitted) (quoting Scherk, 417 U.S. at 520 n.15, 94 S. Ct. at 2457 n.15); see also Bautista, 396 F.3d at 1299 ("Indeed, to read industry-

61

specific exceptions into the broad language of the Convention Act would be to hinder the Convention's purpose . . . .").

These precedents reveal the Supreme Court's and our Circuit's recognition of the reciprocal nature of the Convention and the need for uniformity in the enforcement of arbitration agreements. Under Lindo's reading of the Convention—which implies that arbitration agreements are invalid ab initio whenever the application of foreign law may displace a U.S. statutory claim—the public policy exception would swallow the rule that signatory nations "shall recognize" arbitration agreements.[32] New York Convention, art. II(1).

We recognize that NCL's brief on appeal argues that "Lindo has failed to establish that international arbitration will nullify or lessen his U.S. statutory claim," "Lindo has failed to establish that the choice-of-law provision would deprive him of the Jones Act or of any remedy," "[t]here is no evidence in the record establishing that application of Bahamian Law will prohibit the arbitrator's consideration of Lindo's claim based on the Jones Act," and "there is not one shred of evidence that Bahamian law will prevent [Lindo] from reaching his Jones

---

[32]Furthermore, Lindo's preferred rule would provide litigants who seek to avoid their arbitration bargain with a ready means to do so; namely, by injecting a U.S. statutory claim into a complaint, regardless of its viability. Cf. Scherk, 417 U.S. at 516-17, 94 S. Ct. at 2456 ("A parochial refusal by the courts of one country to enforce an international arbitration agreement would . . . invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.").

Act claim." Appellee's Br. at 13-14, 23. We need not examine the veracity of these claims to reach the conclusion we set forth here, however. Cf. Vimar, 515 U.S. at 541, 115 S. Ct. at 2330 (stating that, "[u]nder the circumstances of this case," it was "correct to reserve judgment on the choice-of-law question, as it must be decided in the first instance by the arbitrator" (citation omitted)).

**G.  Congress Has Not Excepted Jones Act Claims From Arbitration**

Lastly, Lindo contends that a 2008 Amendment to the Jones Act, which deleted its venue provision, means Congress has rendered Lindo's Jones Act claim inarbitrable. We style this argument as a claim that Congress created a "subject-matter exception" to arbitrability, as discussed in Mitsubishi. See 473 U.S. at 639 n.21, 105 S. Ct. at 3360 n.21.

In January 2008, Congress amended the Jones Act. See National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 3521(a), 122 Stat. 3, 596 (2008) (codified as amended at 46 U.S.C. § 30104). In so doing, it eliminated the Jones Act's venue provision in subsection (b), which provided: "VENUE.—An action under this section shall be brought in the judicial district in which the employer resides or the employer's principal office is located." 46 U.S.C. § 30104(b) (2007).

Since the Jones Act requires that "[l]aws of the United States regulating

63

recovery for personal injury to, or death of, a railway employee apply to an action under this section," id. § 30104, Lindo contends that the repeal of the Jones Act venue provision thereby entails that the venue provision of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 56,[33] now governs. Lindo next argues that if FELA's venue provision governs Jones Act cases, then so must FELA case law interpreting this provision and so too must 45 U.S.C. § 55, a FELA section that prohibits attempts to contractually limit liability under FELA: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . . ."[34] Id. § 55.

Lindo's claim lacks merit for several reasons. The Committee Report on the 2008 Amendment stated the venue provision's repeal was merely meant to clarify

---

[33]Section 56 provides:
Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States.
45 U.S.C. § 56.

[34]See also Norfolk S. Ry. v. Sorrell, 549 U.S. 158, 168, 127 S. Ct. 799, 807 (2007) (stating that "FELA expressly departed from the common law" by "prohibit[ing] employers from contracting around the Act"); Sea-Land Serv., Inc. v. Sellan, 231 F.3d 848, 851 (11th Cir. 2000) ("The purpose of 45 U.S.C. § 55 is to prevent employers from undermining the liability scheme created by FELA for their negligence.").

existing law:

> This subsection is being repealed to make clearer that the prior law regarding venue, including the holding of Pure Oil Co. v. Suarez, 384 U.S. 202 (1966) and cases following it, remains in effect, so that the action may be brought wherever the seaman's employer does business. Because the codified provision could be read to be inconsistent with that holding, the Committee believes it should be repealed, retroactive to the date of codification . . . .

H.R. Rep. No. 110-437, at 5 (2007) (emphasis added). The purpose of the 2008 Amendment, in other words, was to clarify what had already been settled in 1966 by the Supreme Court's decision in Pure Oil.[35] Indeed, Congress made it clear that no substantive change was being effected by the 2008 Amendment, much less a fundamental revision of international arbitration conducted under the Convention:

> [T]he provisions of this bill are not intended to make any substantive changes to the laws now codified in that title. Like the codification itself, these changes are intended to restate the law without substantive change, including applicable case law interpreting the earlier, pre-codification provisions.

Id. at 2 (emphasis added).

Despite Lindo's appeals to the contrary, Congress's 2008 Amendment to the Jones Act did not signal its intention to "identify any category of claims as to

---

[35]Pure Oil clarified that the definition of residence contained in 28 U.S.C. § 1391(c) (1964)—which enabled a corporation to be sued in any judicial district where it was "doing business"—is applicable to causes of action under the Jones Act, notwithstanding its (now-repealed) venue provision conferring jurisdiction upon the court of the district "in which the employer resides or the employer's principal office is located," 46 U.S.C. § 30104(b) (2007). See Pure Oil, 384 U.S. at 203-07, 86 S. Ct. at 1395-97.

which agreements to arbitrate will be held unenforceable." Mitsubishi, 473 U.S. at 627, 105 S. Ct. at 3354. The repeal of the Jones Act's venue provision hardly warrants the inference that Congress sought to overturn the numerous cases requiring arbitration of Jones Act claims where the Convention applies. Even assuming, arguendo, that § 56 (FELA's venue provision) now applies to Jones Act claims, there is nothing to indicate that § 55 (FELA's prohibition on limiting liability) applies as well. If Congress had intended to render international arbitration clauses unenforceable in Jones Act cases, it could have explicitly done so. Instead, the legislative history of the 2008 Amendment reveals that no such sweeping change was intended at all. Other courts have likewise concluded that § 55 is "inapplicable to seaman arbitration agreements." Harrington v. Atlantic Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (collecting cases), cert. denied, 131 S. Ct. 1054 (2011).

Because we conclude that Congress intended no subject-matter exceptions to arbitrability for Jones Act claims, Lindo's argument fails and the arbitration clause in his Contract must be enforced.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's order granting NCL's motion to dismiss and compel arbitration and denying Lindo's motion to

66

remand.

**AFFIRMED.**

BARKETT, Circuit Judge, dissenting:

In 1985, the Supreme Court issued Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, a landmark opinion upholding an international commercial agreement requiring U.S. statutory antitrust claims to be arbitrated abroad. The Court emphasized that its decision to uphold the agreement turned on the fact that American law would apply in the arbitral proceeding, thus ensuring the vindication of U.S. statutory remedies. Mitsubishi, 473 U.S. at 636–38 & n.19. Indeed, in footnote 19, the Court cautioned in the most forceful language that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy." Id. at 637 n.19.

Tracking that language, Lindo argues in this case that the arbitration agreement in his employment contract—requiring that he submit his federal Jones Act claim of negligence to arbitration in Nicaragua under Bahamian law—effectuates a prospective waiver of his statutory rights and therefore violates public policy. The majority holds, however, that Lindo must first proceed to arbitration before raising this argument because public policy is not a defense to

68

arbitration under the New York Convention ("Convention"),[1] the treaty governing international arbitration agreements and awards. I dissent because I do not believe that Lindo must needlessly wait until after arbitration to raise his public policy argument; rather, I believe that the New York Convention, its implementing legislation, and Supreme Court precedent authorize him to raise this argument up front, before proceeding to arbitration. This view finds additional support in the understanding of the political branches and prominent scholars at the time of the Convention's ratification. I also believe, contrary to dicta in the majority opinion, that the arbitration agreement in this case effectuates precisely the sort of prospective statutory waiver that the Supreme Court has said it "would have little hesitation in condemning . . . as against public policy." Id. Although these two views formed the basis of our decision in Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009), I take this opportunity to expound on them.

I.

As the majority observes, there are two stages of judicial enforcement under the New York Convention: the initial pre-arbitration stage, where a court determines whether to refer a matter to arbitration ("agreement-enforcement

---

[1] United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

stage"); and the subsequent post-arbitration stage, where a court determines whether to enforce a resulting arbitral award ("award-enforcement stage"). With respect to the agreement-enforcement stage, Article II(3) of the Convention requires a court to refer certain matters to arbitration, "unless it finds that the [arbitration] agreement is null and void, inoperative or incapable of being performed." Convention, art. II(3). The threshold issue here is whether an arbitration agreement can be rendered "null and void, inoperative or incapable of being performed" on account of its inconsistency with the forum nation's public policy. If so, Lindo would be permitted to raise his prospective waiver argument at the initial agreement-enforcement stage.

As an initial matter, the meaning of the phrase "null and void" strongly suggests that public policy is a defense to arbitration. See Medellin v. Texas, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). It is well-established that agreements contrary to public policy are characterized in our legal system as "void." See, e.g., Oubre v. Entergy Operations, Inc., 522 U.S. 422, 431 (1998) (Breyer, J., concurring) (defining "void" as something "without any legal effect, say, like a contract the terms of which themselves are contrary to public policy"); Evans v. Jeff D., 475 U.S. 717, 759 (1986) (Brennan, J., dissenting) (referring to the "well-established

70

principle that an agreement which is contrary to public policy is void and unenforceable"). Indeed, Black's Law Dictionary provides that "[a] contract is void ab initio if it seriously offends law or public policy . . . ." Black's Law Dictionary 1709 (9th ed. 2009) (emphasis added). This common understanding—that a contractual provision contrary to public policy is void—must inform the meaning of the Convention's "null and void" clause.

This view is strengthened by Article V(2)(b) of the Convention, which provides that a court need not enforce an arbitral award if such enforcement would be contrary to public policy. Although one might initially wonder whether the Convention's express inclusion of a public policy exception at the award-enforcement stage implies a deliberate omission of such an exception at the agreement-enforcement stage, any such implication is dispelled by the proceedings of the New York Conference. See Medellin, 552 U.S. at 507 (considering "the negotiation and drafting history of [a] treaty"). In fact, the drafters of the Convention proceeded under the assumption that arbitration agreements would be addressed later in a separate Protocol, and thus they were chiefly concerned with the enforcement of arbitral awards, not agreements to arbitrate. Albert Jan van den Berg, The New York Convention of 1958: Towards a Uniform Judicial Interpretation 9, 56 (1981). It was "[n]ot until the final days of the Conference"

71

that it was "realized that such a separation could seriously hamper the effectiveness of the new Convention." Id. at 9. Article II was consequently "drafted in a race against time," id. at 56, and it was inserted "in the closing days of negotiations."[2] Gary B. Born, International Commercial Arbitration: Commentary and Materials 159 (2d ed. 2001). As a result, and despite its importance, "[l]ittle thought, and less drafting attention, was given" to Article II, id., and the drafting history does "not reveal any discussion regarding th[e] words" of the "null and void" clause. Van den Berg, supra, at 154. It would therefore be a mistake to assume that the express inclusion of a public policy exception in Article V(2)(b) implies that such an exception is not encompassed by Article II(3), which was deliberately left broad. See id. at 155 (observing that the "null and void" clause "appear[s] to encompass a broad range of reasons for which an arbitration agreement can be invalid").

To the contrary, it makes good sense to look to Article V(2)(b)'s public policy exception when interpreting Article II(3)'s "null and void" clause. Indeed, we did so in Thomas.[3] Interpreting the Convention this way makes sense because

---

[2] Hence the treaty's title—Convention on the Recognition and Enforcement of Foreign Arbitral Awards—and its conspicuous failure to reference arbitration agreements.

[3] While we cited only Article V(2)(b), we held at the initial stage of enforcement that the agreement was "null and void" on public policy grounds. Thomas, 573 F.3d at 1120–24 & n.17; see Joseph R. Brubaker & Michael P. Daly, Twenty-Five Years of the "Prospective Waiver"

it congruously links the two stages of enforcement.  For example, the First Circuit has observed that failing to so interpret the Convention would require a court to compel arbitration in a dispute involving the sale of slaves, despite knowing full well that any resulting arbitral award would be unenforceable as a matter of public policy.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 723 F.2d 155, 164 n.9 (1st Cir. 1983), aff'd in part, rev'd in part, 473 U.S. 614 (1985).  While this example may be extreme, it illustrates the absurdity and inefficiency of requiring a court to refer a matter to arbitration where it is apparent from the face of the agreement that any subsequent award would be unenforceable as a matter of public policy.

Indeed, the two most authoritative scholarly sources interpreting the Convention around the time of its adoption—both of which have been relied on by the Supreme Court—have taken this view.  First, G. W. Haight, a member of the International Chamber of Commerce delegation to the New York Conference, contemporaneously prepared what remains the most comprehensive summary of the proceedings.  G. W. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations

Doctrine in International Dispute Resolution: Mitsubishi's Footnote Nineteen Comes to Life in the Eleventh Circuit, 64 U. Miami L. Rev. 1233, 1257 (2010) (observing that, despite Thomas's citation to Article V(2)(b), "Article II(3) . . . appears to have influenced the court's decision").

73

Conference (May/June 1958). Despite his own delegation's preference for arbitration, Haight expressed the view that "courts may under [the 'null and void' clause] be allowed some latitude; they may find an [arbitration] agreement [to trigger this clause] if it offends the law or the public policy of the forum." Id. at 28.

Second, a seminal law review article published in the Yale Law Journal shortly after the Convention entered into force reached the same conclusion: "Article [V(2)(b)] allows the forum State to refuse enforcement of an award if the recognition and enforcement of the award would be contrary to its public policy. It can be expected that the forum State will similarly refuse . . . to order the parties to arbitration where its public policy renders the arbitral agreement 'null and void, inoperative or incapable of being performed.'" Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1064 n.71 (1961).[4]

---

[4] Other commentators have expressed this view as well. See, e.g., Robert J. Barry, Application of the Public Policy Exception to the Enforcement of Foreign Arbitral Awards Under the New York Convention: A Modest Proposal, 51 Temp. L.Q. 832, 836 n.16 (1978) ("Article II of the New York Convention, relating to the obligation of a court to refer parties to arbitration unless it finds that the said agreement is null and void, is, in effect, a public policy exception to the obligation of the courts of a contracting state to refer the parties to arbitration.") (quotation marks omitted); Comment, Greater Certainty in International Transactions Through Choice of Forum?, 69 Am. J. Int'l L. 366, 371 (1975) (stating that the Convention "permit[s] the courts of one state to refuse to enforce an agreement to arbitrate which is void because [it is] contrary to the public policy of that state").

Significantly, this interpretation of the "null and void" clause is also that of the political branches in the United States. When submitting the Convention to the Senate for ratification in 1968, President Johnson attached a memorandum prepared by the Department of State, adopting Quigley's view that the "null and void" clause incorporated Article V(2)'s exceptions to the enforcement of arbitral awards. S. Exec. Doc. E, 90th Cong., 2d Sess. 19 (1968) ("Paragraph 3 [of Article II] . . . provid[es] that a court in a contracting country, when seized of an action in respect of which the parties have made an agreement within the meaning of Article II, shall, upon the request of one of the parties, refer the parties to arbitration unless it finds the agreement null and void, inoperative, or incapable of being performed. Here again, it appears that the exceptions provided in Article V, paragraph 2, with respect to the enforcement of awards, would apply."). And, in this respect, the State Department anticipated that Article V(2)(b)'s public policy exception "would give the courts to which application is made considerable latitude in refusing enforcement." Id. at 21. I find it highly significant that the political branches ratified the Convention with the apparent understanding that the enforcement of international arbitration agreements would not come at the expense

of all other U.S. public policies.[5]  See Abbott v. Abbott, 560 U.S. __, __, 130 S.

Ct. 1983, 1993 (2010) ("It is well settled that the Executive Branch's

interpretation of a treaty is entitled to great weight.") (quotation marks and citation

omitted).

Contrary to the majority's suggestion, neither Scherk v. Alberto-Culver, 417

U.S. 506 (1974) nor Mitsubishi rejected this understanding of the Convention.

See Maj. op. at 56–57.  Indeed, the Court in Scherk specifically declined to

"reach[] the issue of whether the Convention . . . would require of its own force

that the agreement to arbitrate be enforced in the present case . . . ."  417 U.S. at

520 n.15.  And it is telling that the majority in Scherk did not dispute the dissent's

assertion that Article II(3) includes public policy as a defense to arbitration.  Id. at

530 & n.10, 534 (Douglas, J., dissenting).  Nor did the Court reject this

proposition in Mitsubishi.  To the contrary, the clear implication of footnote 19 is

that a public policy defense can be raised at the agreement-enforcement stage.  See

Mitsubishi, 473 U.S. at 637 n.19 ("[I]n the event the choice-of-forum and

choice-of-law clauses operated in tandem as a prospective waiver of a party's right

to pursue statutory remedies . . . , we would have little hesitation in condemning

---

[5]  Nothing in the text or legislative history of the Convention's implementing legislation suggests a contrary congressional understanding.  See 9 U.S.C. § 206; S. Rep. No. 91-702 (1970); H. Rep. No. 91-1181 (1970).

76

the <u>agreement</u> [not the award] as against public policy.") (emphasis added).

The Supreme Court confirmed in <u>Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer</u>, 515 U.S. 528 (1995) that a public policy defense based on the prospective waiver doctrine may sometimes be raised at the agreement-enforcement stage. In that case, the Court upheld an international agreement requiring a U.S. statutory claim to be arbitrated abroad under foreign law. <u>Id.</u> at 541. Although the petitioner argued at the initial stage that this agreement effectuated a prospective statutory waiver, the Supreme Court found this argument "premature." <u>Id.</u> at 540. Significantly, however, the Court repeatedly emphasized that its decision turned on the critical fact that the district court had retained jurisdiction over the case, thus guaranteeing that the petitioner would have a subsequent opportunity to raise his public policy defense at the award-enforcement stage. <u>Id.</u> at 532, 540–41; <u>see</u> <u>id.</u> at 542 (O'Connor, J., concurring in the judgment) (reiterating that the majority's holding turned on the district court's retention of jurisdiction). And the Court made clear that "[w]ere there no [such] subsequent opportunity for review" at the award-enforcement stage, "and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's rights to pursue statutory remedies, we would have little hesitation in condemning the agreement as against public policy.'" <u>Id.</u>

77

at 540 (quoting <u>Mitsubishi</u>, 473 U.S. at 637 n.19) (ellipsis omitted).  Thus, <u>Vimar</u>

supports the proposition that a public policy defense based on the prospective

waiver doctrine may be raised at the initial agreement-enforcement stage when

there will not be any subsequent opportunity for review.

In this case, Lindo's prospective waiver argument is not premature because

the district court did not retain jurisdiction.  Instead, the court issued a final order

compelling arbitration, dismissing Lindo's complaint, and closing the case.  Thus,

unlike in <u>Vimar</u>, there is no guarantee that Lindo will be afforded an opportunity

to raise his prospective waiver argument at the award-enforcement stage.[6]  As a

result, he may raise it at the initial agreement-enforcement stage.[7]

---

[6]  The majority counters that Lindo could bring a separate action following arbitration under 9 U.S.C. § 207.  But, unlike Chapter 1 of the Federal Arbitration Act, § 207 only authorizes an action to "confirm" an arbitral award.  <u>Cf.</u> 9 U.S.C. §§ 10–11 (authorizing motions to "vacate," "modify," and "correct" an arbitral award).  Thus, it is by no means clear that Lindo could rely on § 207 to attack (rather than confirm) an adverse arbitral award at the award-enforcement stage.  Moreover, under the majority's logic, there would <u>always</u> be a subsequent opportunity for review, even though the statement in <u>Vimar</u>—which did not even mention § 207—plainly contemplated cases in which there would not such an opportunity.  This is such a case.

[7]  Further bolstering this Supreme Court precedent is case law from England, which is "entitled to considerable weight" given that nation's status as a fellow signatory to the Convention.  <u>Abbott</u>, 560 U.S. at __, 130 S. Ct. at 1993 (quotation marks and citation omitted); <u>see</u> <u>Accentuate Ltd. v. Asigra Inc.</u>, [2009] Q.B. ¶¶ 72, 87–89 (Eng.) ("Where an arbitration clause purports to apply a foreign law which does not give effect to a mandatory provision of EU law, then the agreement to arbitrate is void . . . .  [T]his court [must] give effect to the mandatory provisions of EU law, notwithstanding any expression to the contrary on the part of contracting parties. . . .  Accordingly, the arbitration clause would be 'null and void' and 'inoperative' . . . .").

Notwithstanding all of the authority discussed above, the majority reads our decision in <u>Bautista v. Star Cruises</u>, 396 F.3d 1289 (11th Cir. 2005), in a manner that precludes Lindo from raising his public policy defense at the agreement-enforcement stage. In that case, this Court stated (without analysis) that the "Convention's null and void clause 'must be interpreted to encompass only those [breach of contract defenses]—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale.'" <u>Id.</u> at 1302 (quoting <u>DiMercurio v. Sphere Drake Ins. PLC</u>, 202 F.3d 71, 79 (1st Cir. 2000)); <u>see</u> <u>Bautista</u>, 396 F.3d at 1302 ("Domestic defenses to arbitration are transferrable to a Convention Act case only if they fit within th[is] limited scope of defenses . . . ."). The majority asserts that, by so limiting the scope of the "null and void" clause, <u>Bautista</u> effectively eliminated national public policy as a defense.

However, construing <u>Bautista</u> this way, as the majority does, places it in conflict with Supreme Court precedent. Precluding a public policy defense from ever being raised at the agreement-enforcement stage conflicts with <u>Vimar</u>'s holding that such a defense may be raised at that stage when there is no subsequent opportunity for review. Although <u>Vimar</u> did not specifically discuss the "null and void" clause, that clause is the only authority upon which the Court's holding could have been based. <u>See</u> Brubaker & Daly, <u>supra</u> note 3, at 1273

79

("[T]he null and void clause provides the only possible basis under the New York Convention for courts to apply the prospective waiver doctrine and refuse to compel parties to arbitrate.").

Moreover, by suggesting that only certain domestic defenses to arbitration apply in the international context, the majority's reading of Bautista overlooks a key provision of the legislation implementing the Convention. That legislation, codified as Chapter 2 of the Federal Arbitration Act ("FAA"), contains a residual clause providing that Chapter 1 of the FAA, governing arbitration generally, "applies to actions and proceedings brought under [Chapter 2] to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the Convention as ratified by the United States." 9 U.S.C. § 208. Chapter 1, in turn, provides that arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As discussed above, public policy constitutes such a ground. And because there is nothing in Chapter 2 or the Convention that excludes public policy as a defense to international arbitration, see 9 U.S.C. § 206; Convention, art. II(3), the residual clause operates to ensure its inclusion.

Finally, exacerbating the conflict between the majority's reading of Bautista and all of the above authority is that Bautista is devoid of any reasoning or

80

analysis. In limiting the scope of the "null and void" clause to defenses that are capable of neutral international application, Bautista simply quotes the First Circuit's decision in DiMercurio as if this was a settled proposition of law. DiMercurio, however, traces back to Ledee v. Ceramiche Ragno, 684 F.2d 184, 187 (1st Cir. 1982) and I.T.A.D. Assocs., Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir. 1981), two decisions that pre-date both Mitsbushi and Vimar. Even at that time, the First and Fourth Circuit's interpretation of the "null and void" clause was hardly gospel. See Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazioni v. Lauro, 712 F.2d 50, 53 (3d Cir. 1983) (approving Ledee and I.T.A.D., but concluding that an agreement may also be rendered "'null and void' . . . when it contravenes fundamental policies of the forum state") (citation omitted). And this is for good reason. Those decisions provided only a cursory analysis of the Convention and simply relied on the following dicta in Scherk: "[T]he goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed . . . in the signatory countries." 417 U.S. at 520 n.15. This rather generic statement of purpose is reflected in the strong presumption in favor of enforcement. But it hardly signifies

that, by ratifying the Convention, the United States sought to require courts to enforce arbitration agreements that contravene a strong U.S. public policy. Indeed, it is telling that this dicta in Scherk is supported by a citation to the State Department's ratification memorandum and Leonard Quigley's Yale Law Journal article, see id., two sources that, as discussed above, conclude that Article II(3)'s "null and void" clause includes a public policy exception to arbitration.

In effectively excluding public policy from the scope of the "null and void" clause, the majority's reading of Bautista wholly fails to account for the text of the clause, Article V(2)(b) of the Convention, the residual clause in the Convention's implementing legislation, and contrary views held by the political branches at ratification, prominent scholars, and even the Supreme Court itself. Based on the great weight of this authority, I believe that the "null and void" clause encompasses a public policy defense that may be raised at the initial agreement-enforcement stage.

II.

Although the majority holds that Lindo may not raise his public policy

defense at this initial stage, it gratuitously goes on to assert that the arbitration agreement does not violate public policy. Maj. op. at 58–65. Needless to say, this discussion is wholly unnecessary to the majority's resolution of this case and is plainly dicta. See, e.g., Schwab v. Crosby, 451 F.3d 1308, 1327 (11th Cir. 2006) ("[T]hat which is not necessary to the decision of a case is dicta."). Nonetheless, I write to explain my contrary view that a faithful application of the Supreme Court's prospective waiver doctrine compels the conclusion that the arbitration agreement in this case contravenes public policy.

As explained at the outset, the Supreme Court articulated the prospective waiver doctrine in Mitsubishi in order to ensure the preservation of federal statutory rights in foreign arbitral proceedings. The Court repeatedly emphasized this point in footnote 19 and the surrounding text. See Mitsubishi, 473 U.S. at 637 n.19 (stressing the litigant's "right to pursue statutory remedies" in the arbitral proceeding); id. at 637 (stressing the litigant's ability to "effectively . . . vindicate its statutory cause of action in the arbitral forum"); id. at 638 (suggesting that the foreign arbitral proceeding must "ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed"); id. (suggesting that the arbitral proceeding must take "cognizance of the antitrust claims and actually decide[] them"). And the Court's decision to uphold the agreement in that case

83

turned on the very fact that American law, not foreign law, would apply in the arbitral proceeding. See id. at 636–38 & n.19.

The majority asserts that footnote 19 of Mitsubishi is "undisputably dicta." Maj. op. at 47. This cannot be the case, as this footnote was critical to the Court's reasoning and the outcome of the case. Merely because the Court did not find a prospective waiver there does not make that language—forming part of the Court's core reasoning—dicta. Indeed, it is revealing in this respect that the Supreme Court has reaffirmed the prospective waiver doctrine twice since Mitsubishi, and has done so as recently as 2009. See 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, __, 129 S. Ct. 1456, 1474 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld . . . .") (citing Mitsubishi, 473 U.S. at 637 & n.19); Vimar, 515 U.S. at 540 (quoting with approval the prospective waiver language in Mitsubishi, 473 U.S. at 637 n.19). And this Court has previously characterized footnote 19 of Mitsubishi not as dicta, but rather as controlling precedent that needed to be distinguished. See Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1293–94, 1298–99 (11th Cir. 1998).[8]

---

[8] Even if such a forceful and recurring doctrine could be considered dicta, our precedent prohibits us from "lightly cast[ing] [it] aside." Schwab, 451 F.3d at1325–26 (citation omitted); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir. 1998); Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997).

Moreover, discounting the Supreme Court's prospective waiver doctrine has serious implications. In doing so, the majority effectively transforms the enforcement of international arbitration agreements into the top U.S. public policy. As discussed above, there is nothing to suggest that the political branches ever intended such a result. And the prospective waiver doctrine operates to avoid that result by ensuring that the enforcement of such agreements will not be elevated over every other U.S. public policy—including policies dating back to the very founding of this country. Lindo's case exemplifies this point.

From the earliest days of the Republic, there has been a "great public policy of preserving [seamen as an] important class of citizens for the commercial service and maritime defence of the nation." Harden v. Gordon, 11 F. Cas. 480, 483 (No. 6,047) (C.C.D. Me. 1823) (No. 6,047) (Story, J.). Indeed, "[s]eamen have always been regarded as wards of the admiralty, and their rights, wrongs, and injuries a special subject of the admiralty jurisdiction. The policy of Congress, as evidenced by its legislation, has been to deal with them as a favored class." Bainbridge v. Merchants' & Miners' Transp. Co., 287 U.S. 278, 282 (1932) (citation omitted). Consequently, seamen like Lindo have traditionally been afforded special legal remedies. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 354 (1991).

Among the special remedies afforded to seamen is the Jones Act, which

provides a statutory cause of action in negligence to any "seaman injured in the course of employment." 46 U.S.C. § 30104. Congress enacted this statute to "provide liberal recovery" for seamen, Kernan v. Am. Dredging Co., 355 U.S. 426, 432 (1958), in order to assuage their hazardous "exposure to the perils of the sea." Chandris, Inc. v. Landris, 515 U.S. 347, 354 (1995) (citation and quotation marks omitted); accord Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 874 n.5 (11th Cir.), cert. denied, 131 S. Ct. 178 (2010). See also David W. Robertson, A New Approach to Determining Seaman Status, 64 Tex. L. Rev. 79, 80 (1985) (explaining that the "perils of the sea . . . include the full range of dangers associated with deep water, wind and weather, tides and currents, ocean predators, great distances from shore, relative isolation, and inaccessibility of shore-side facilities for aid and succor").

To achieve that purpose, the Jones Act affords seamen "heightened legal protections," Chandris, 515 U.S. at 354, including the right to "recover . . . with a lower showing of proximate cause than would be required in a non-admiralty case." Dempsey v. Mac Towing, Inc., 876 F.2d 1538, 1542 (11th Cir. 1989). Rather than showing, for example, that the employer's negligence was a substantial factor in causing the injury, "causation may be found [under the Jones Act] if the defendant's acts or omissions played any part, no matter [h]ow small, in

bringing about the injury." McClow v. Warrior & Gulf Navigation Co., 842 F.2d 1250, 1251 (11th Cir. 1988) (citation omitted). This so-called "featherweight" causation standard, id. (citation omitted), dramatically increases the likelihood of recovery, thus reflecting the strong public policy deeply embedded in our nation's history.

Enforcing the arbitration agreement in this case directly contravenes that public policy. The agreement unambiguously requires Lindo to submit his Jones Act claim to arbitration under Bahamian law. But there is no Jones Act in the Bahamas. Instead of a relaxed or featherweight causation standard, Bahamian law requires a seaman to prove a direct causal link between the employer's negligence and the injury, a much more stringent standard. The result is that the arbitral tribunal will neither "take cognizance of the statutory cause of action" nor "actually decide" a claim under the Jones Act, making the prospect of recovery substantially more difficult and unlikely. Mitsubishi, 473 U.S. at 637–38 & n.19. In short, the agreement results in the evisceration, not the vindication, of Lindo's statutory right under the Jones Act to establish causation by a mere featherweight.[9]

_____

[9] The majority speculates that Lindo may ultimately prevail under Bahamian law. That unlikely possibility, however, does not lessen the agreement's evisceration of the statutory right, which is not a right of recovery, but rather a right to establish causation under a featherweight standard. Moreover, the majority's speculation is troubling in this case because, as explained above, there is no guarantee that Lindo will be afforded a subsequent opportunity for review at the award-enforcement stage.

We employed this same reasoning in Thomas.  In that case, we considered a

contractual provision requiring a cruise-ship employee to arbitrate his statutory

claim under the Seaman's Wage Act in the Phillippines under Panamanian law.

Thomas, 573 F.3d at 1115–20 & n.9.  Like the Jones Act, the Seaman's Wage Act

affords seamen special legal remedies, namely the right to obtain treble damages

for late wage payments.  See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564,

572 (1982) ("[T]he evident purpose of the statute is to secure prompt payment of

seamen's wages and thus to protect them from the harsh consequences of arbitrary

and unscrupulous action of their employers, to which, as a class, they are

peculiarly exposed.") (ellipsis, quotation marks, and citation omitted).  We noted

the importance of this right in Thomas, 573 F.3d at 1115 n.3, for it constitutes the

very mechanism by which Congress sought to enforce the statute's purpose.  See

Griffin, 458 U.S. at 572 (explaining that "Congress has chosen to secure [the

statute's] purpose through the use of potentially punitive sanctions designed to

deter negligent or arbitrary delays in payment").  Because we implicitly found that

Panamanian law did not authorize treble damages for late wage payments,[10] we

held that the arbitration agreement effectuated a prospective waiver of Thomas's

---

[10]  Although Thomas did not specifically discuss Panamanian law, the clear implication
from our decision was that it did not authorize treble damages for late wage payments.

88

statutory rights under the Seaman's Wage Act, in violation of the same general public policy at issue in this case. See id. at 1123–24.

Although Thomas is almost directly on point and closely follows the Supreme Court's prospective waiver doctrine, the majority here relies heavily on our decision in Lipcon. In that non-arbitration case, this Court enforced an international agreement requiring U.S. statutory securities claims to be resolved in English courts under English law. Applying M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972)—which established the framework for evaluating international forum-selection clauses—we concluded, inter alia, that these choice clauses did not violate public policy because, even though English law was "less favorable" to the American plaintiffs than U.S. securities laws, it provided "adequate remedies" allowing the "polic[ies] underlying United States securities law [to] be vindicated . . . ." See Lipcon, 148 F.3d at 1297–99.

The majority reads Lipcon far too broadly. It suggests that Lipcon stands for the sweeping proposition that an international agreement does not violate public policy merely because the applicable foreign law is less favorable than U.S. law. Such a broad reading, however, would place Lipcon in direct conflict with the Supreme Court's prospective waiver doctrine. In order to reconcile Lipcon with that doctrine, it is necessary to emphasize instead Lipcon's finding that

89

English remedies, despite being less favorable, nonetheless allowed for the "vindicat[ion]" of the policies underlying the federal securities law. Id. at 1299. Unsurprisingly, that finding was tied to the particular facts and circumstances of the case, see id. at 1297–99 (relying on the particular claims, defendants, and provisions of English law), thus yielding a narrow holding with limited prospective applicability.

The upshot is that, contrary to the majority's assertion, Thomas does not conflict with Lipcon, and Lipcon does not control this case. For one thing, Lipcon did not even involve an arbitration agreement, much less the New York Convention. Moreover, Thomas and this case involve fundamentally different facts and circumstances than Lipcon—different federal statutes, different public policy considerations, and different choice clauses.[11] Thus, Lipcon's narrow, fact-specific public-policy holding hardly precluded a contrary result in Thomas or this case, where the foreign law to be applied would wholly vitiate—not vindicate—a critical statutory right and contravene a strong and deeply-rooted U.S. public policy.

---

[11] For example, contrary to this case and Thomas, the choice clauses in Lipcon called for the dispute to be resolved in, and under the laws of, England, a well-known and developed judicial system. See Brubaker & Daly, supra note 3, at 1247 ("[M]any U.S. courts often [conduct the Bremen] analysis in a deferential manner if the forum-selection clause calls for litigation in the courts of a well-known or developed judicial system.").

Finally, it bears mention that <u>Lipcon</u> itself did not meaningfully distinguish the Supreme Court's prospective waiver doctrine. The Court in <u>Lipcon</u> first suggested that the prospective waiver doctrine was not applicable because <u>Mitsubishi</u> involved antitrust claims, not securities claims. <u>Id.</u> at 1294. Of course, <u>Mitsubishi</u>'s articulation of the doctrine did not turn on the fact that antitrust claims were at issue; the Supreme Court's subsequent reiteration of the doctrine in <u>Vimar</u>—involving claims brought under the Carriage of Goods by Sea Act, a completely different federal statute—should have made that clear. <u>Lipcon</u>, however, did not cite <u>Vimar</u>, decided only three years earlier.

The Court in <u>Lipcon</u> also relied on <u>Mitsubishi</u>'s statement that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes" counsel in favor of enforcing international arbitration agreements. <u>Id.</u> (quoting <u>Mitsubishi</u>, 473 U.S. at 629). Again, these policy concerns admittedly account for the presumption in favor of enforcement. But that presumption is overcome by the Supreme Court's accompanying articulation of the prospective waiver doctrine.

In sum, I believe the Supreme Court meant what it said in <u>Mitsubishi</u>. The majority, however, gives the Supreme Court's prospective waiver doctrine short

91

shrift. I would simply take the Supreme Court at its word, as we are required to do, and apply the doctrine to the case before us. And such an application compels the conclusion that the arbitration agreement in Lindo's contract effectuates precisely the sort of prospective statutory waiver that the Supreme Court "would have little hesitation in condemning as against public policy." <u>Mitsubishi</u>, 437 U.S. at 637 n.19. Accordingly, I would hold that the arbitration agreement in Lindo's contract is "null and void" and thus unenforceable.